## WESTERN UNION TELEGRAPH CO. v. BUCHANAN. (No. 6866.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 31, 1923.)

**1. Libel and slander ⬯7(2)—Charge of misappropriating money not libelous per se.**

The statement by a telegraph superintendent that a woman agent of the company had appropriated or misappropriated company money, made to her brother, was not libelous per se under the circumstances, where plaintiff agent had erroneously taken credit in her accounts for money she was not entitled to.

**2. Libel and slander ⬯44(1), 45(1)—Communications by interested persons, or one with duty to perform, or to persons having a corresponding interest, are privileged.**

A communication made in which a party has an interest, or in reference to which he has a duty to perform, or if made to a person having a corresponding interest or duty, although including criminating matter, which without this privilege would be slanderous and actionable, is privileged.

**3. Libel and slander ⬯45(1)—Statement by superintendent to brother of woman employee that she had appropriated company money held qualifiedly privileged.**

Where a telegraph superintendent discovered that a local agent had taken credit in her accounts for money she was not entitled to, his statement to her brother that she had "misappropriated company money," was qualifiedly privileged; it being his duty to correct such errors, and the brother having a corresponding interest in his sister's welfare.

**4. Libel and slander ⬯5—Malice not inferred from privileged communication.**

When a communication is privileged, malice cannot be inferred from the character of the language used, but may be determined only by attendant or surrounding circumstances.

**5. Libel and slander ⬯7(2) — Charge that plaintiff did "appropriate" money not libelous per se.**

A mere statement in a telegram passing between officers of the telegraph company that an agent took credit for expense and appropriated the money does not charge a crime; the word "appropriate" meaning "to take to oneself, in exclusion of others; claim or use, as by an exclusive right; set apart or assign to a particular use."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Appropriate—Appropriation.]

**6. Libel and slander ⬯45(2) — Confidential business publication privileged.**

The transfer of a telegram from one official of the telegraph company to another, informing the latter that a woman agent had taken credit for money to which she was not entitled, and appropriated the same, was privileged as a confidential business communication; there being no excessive publication, and nothing in the conduct of the company officers evidencing an abuse of the privilege.

**7. Libel and slander ⬯5—Privileged communications presumed not malicious.**

Malice may be inferred from the falsity of a charge or imputation of a crime unless the occasion is privileged; but, if the occasion is privileged, the presumption of good faith must be overcome by evidence of malice, and the burden of proof is on the plaintiff.

**8. Libel and slander ⬯104(1)—Petition for plaintiff's reinstatement as telegraph office manager, signed by business men, not admissible to show malice resulting in her discharge.**

In an action by a former telegraph office manager for libel and slander, a petition signed by friends of plaintiff, requesting that she be reinstated as defendant's manager, was incompetent and inadmissible to rebut defendant's testimony that she was discharged for inefficiency, and not on account of any malice on the part of the telegraph company's officers.

Appeal from District Court, Guadalupe County; C. K. Quinn, Judge.

Action by Bettie Buchanan against the Western Union Telegraph Company. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Goeth, Webb & Goeth, of San Antonio, and P. E. Campbell, of Seguin, for appellant.

H. E. Short, Jas. Greenwood, and A. P. Mueller, all of Seguin, for appellee.

COBBS, J. This is an action for libel brought by appellee against appellant.

The Western Union Telegraph Company is a corporation operating its wires broadcast throughout the United States and elsewhere, transporting commercial as well as private messages for pay, with offices, operators, and everything necessary to receive, transmit, and deliver such messages. One of said offices so equipped is in Seguin, Tex., where appellee was the manager and operator, and required to handle appellant's business, receive money, and make reports to officers of the company at Dallas of the business handled by her. C. A. Cline was the district commercial manager of the Western Union Telegraph Company, appellant, whose duties consisted in visiting Seguin and the various other Western Union offices under his jurisdiction and giving the operators and employees certain instructions, and correcting any defects in the routine handling of the business and the irregularities; also to make transfers of offices in changing operators, being a supervisory position in the commercial end of it. The commercial department is that department which accepts and transmits messages, delivering them, and taking care of the accounts, accounting and booking it up; handling the receipts and booking it up.

J. F. Wilson was the district commercial

superintendent of the Western Union, with headquarters at Dallas. His district covers the states of Texas and Louisiana, excepting the larger cities of New Orleans, San Antonio, El Paso, Houston, Dallas, and Fort Worth. It includes Seguin. His district has approximately 200 offices. After June 1, 1920, he employed managers for the various offices, and discharged or relieved employees. He did not know appellee in the year 1920. We here quote from appellee's brief as a statement of the grounds upon which a recovery is sought, to wit:

"This suit was brought by Bettie Buchanan for damages claimed to have been sustained by her by reason of alleged slanderous statements made by C. A. Cline, employee of the said appellant telegraph company, charging plaintiff with having misappropriated $7.50 belonging to the said company, said statement having first been made to the brother of plaintiff, A. M. Erskine, and afterwards discussed over the wire by said C. A. Cline with one J. F. Wilson, the district commercial superintendent of defendant company at Dallas, the said statement being set forth in the plaintiff's petition as stated to her brother as follows: 'Your sister (meaning plaintiff) has misappropriated money belonging to the company (meaning the Western Union Telegraph Company) and she had better resign her position (meaning that the plaintiff, Mrs. Bettie Buchanan, had better resign as local manager of the defendant company)'— thereby charging and intending to charge the plaintiff with having misappropriated and embezzled money belonging to the defendant company, and that on account thereof she had better resign as local manager of said defendant company."

The defense was a general denial, truth of the charges, conditionally privileged, and acting in the discharge of a social, moral, and public duty; that the statements were made in good faith, and in the belief that they were true.

The case was tried with a jury upon special issues submitted, and upon their findings in favor of appellee a judgment was entered against appellant in the sum of $500. The immediate cause of the controversy grows out of a misunderstanding that appellee had as to her right to a credit of $7.50 for lights she claimed to belong to her, and be applied by her in the settlement of her accounts, upon instructions from Mr. J. F. Wilson in writing for lights. The latter referred to is as follows:

"Manager, Seguin, Texas: We are again returning form 86, comparative statement for June, to you for completion. You failed to show the total increase or decrease under revenue and receipts, also expenses. This is found by adding all decreases, all increases, and subtracting totals. You failed to take credit for light expense. Since April G. M. 10 has approved this expense at 2.50 per month. Please complete and return to our office immediately.     [Signed]   J. F. Wilson,
                 "District Com'l Supt.
"Dallas, Texas, July 27, 1920."

During the time Mr. Cline was checking her accounts in her office, a controversy arose over the matter, and much feeling was engendered thereby, both parties becoming heated in the argument, and indulging freely in the use of adjectives. There was a number of things that happened while Cline was there in respect to her handling of the business that displeased him. Appellee was very nervous, and probably overworked, which made it difficult for her to quietly and calmly discuss the matters at hand. Cline left the office to seek an interview with her brother concerning the misunderstanding. The language used alleged to be specially libelous grows out of the alleged conversation between C. A. Cline and A. M. Erskine, the brother of appellee, at Nolte's Bank, in which—

"Cline told him to try to get his sister to resign her job and that she had misappropriated the company's money. I asked him first, though, why it was he wanted her to resign, and he said: 'Well, for several reasons.' I said: 'What are they?' He said: 'Well, one is because she has misappropriated company money.' And I asked her afterwards about it, and she said the money was charged up to electric light account on letter of instructions from Wilson. No; he didn't say how much; but he said he wanted her to resign because she had misappropriated company money. I told him I knew she did not misappropriate any money for things like that, especially in small amounts like she would be getting from the Western Union here. Yes; I went to see my sister the next day, and I informed her that Mr. Cline had spoken to me about this matter; I told Cline, in the presence of my sister, then, that he had talked so ugly to her that if he ever done it again I would slap him so hard he would never forget it. I don't know whether Cline was excited when he came in the bank or not; he may not have been. No; he never met me before and did not know me, Cline did not talk loud there in the bank; neither did I. Yes; he went in the back office there of the bank, and I went with him, to do the talking about this matter, and I don't know that anybody else heard our conversation; I don't know that they did outside of myself."

[1] It is too clear for argument and in the light of all the surrounding circumstances and testimony that the word "misappropriated" or "appropriated" was not and could not have been used in the sense to charge against her a crime per se. They were discussing the question as to appellant's keeping the money under the direction of Wilson for lights. Appellee finally conceded the point and returned the money. Not only did Cline and appellant disclaim any intention to charge her with a crime, but spoke of her high moral character in fitting terms.

[2, 3] Naturally the word as used, and perhaps the brusque way in which Cline brought up the subject to her brother, and his rude speech and impolite treatment of the lady herself, was most offensive. Still that would not justify a recovery on the facts in this

case, for, whether it be construed as charging a crime in respect to the retention of the money, it was made to her brother alone, and not within the hearing of any other person. A communication made in which a party has an interest, or in reference to which he has a duty to perform, or if made to a person having a corresponding interest or duty, although having criminating matter which without this privilege would be slanderous and actionable, is privileged. Especially so if such person has knowledge of facts which, if true, do or may affect the rights and interests of another to whom he owes a duty, then he has the right in good faith to communicate such belief. Missouri Pacific Ry. Co. v. Richmond, 73 Tex. 568, 11 S. W. 555, 4 L. R. A. 280, 15 Am. St. Rep. 794; Cranfill v. Hayden, 97 Tex. 544, 80 S. W. 609; Simmons v. Dickson, 110 Tex. 230, 213 S. W. 612, 218 S. W. 365; I. & G. N. Ry. Co. v. Edmundson (Tex. Com. App.) 222 S. W. 181; Bradstreet v. Gill, 72 Tex. 121, 9 S. W. 753, 2 L. R. A. 405, 13 Am. St. Rep. 768; Foley Bros. Dry Goods Co. v. McClain et al. (Tex. Civ. App.) 231 S. W. 459; Schulze v. Jalonick, 18 Tex. Civ. App. 296, 44 S. W. 580; 17 Ruling Case Law, p. 368; 25 Cyc. p. 394; Faris v. Starke, 9 Dana (Ky.) 128, 33 Am. Dec. 536; Long v. Peters, 47 Iowa, 239; Atwill v. Mackintosh, 120 Mass. 177; Livingston v. Bradford, 115 Mich. 140, 73 N. W. 135; Moore v. Butler, 48 N. H. 161; McCarty v. Lambley, 20 App. Div. 264, 46 N. Y. Supp. 792; Brow v. Hathaway, 13 Allen (Mass.) 239.

Cline, the employer and agent, had an interest in the subject-matter under investigation, for it was his special duty to investigate the appellee's management and conduct in the business of his employer, and to correct just such errors as were made by appellee in retaining the $7.50 credit allowed for light expenses. There was a further duty owed to the public to provide efficient telegraphic service. A brother always has an interest in his sister's welfare, social, financial, or moral, that would materially affect her. That duty he recognized, and to that end promptly called Cline to an account for the supposed insult and indignity. But the alleged libelous and slanderous terms applied to his sister, a female relative, spoken in the exercise of a social duty, showing a good motive by Cline, a person interested, and spoken to a person interested, as the brother of appellee, with a view to the welfare of the parties concerned and thus communicated to a relative, have been frequently held to be qualifiedly privileged. 17 Ruling Case Law, p. 368; Faris v. Starke, 9 Dana (Ky.) 128, 33 Am. Dec. 536; 25 Cyc. 394; McCarty v. Lambley, 20 App. Div. 264, 46 N. Y. Supp. 792; Brown v. Hathaway, 13 Allen (Mass.) 239; Long v. Peters, 47 Iowa, 239; Atwill v. Mackintosh, 120 Mass. 179; Livingston v.

Bradford, 115 Mich. 140, 73 N. W. 135; Moore v. Butler, 48 N. H. 161.

[4] When a communication is privileged, malice cannot be inferred from the character of the language used, but may be determined only by attendant or surrounding circumstances. Cline did not discharge the appellee, for she was discharged by J. F. Wilson, the district commercial superintendent. He stated, and it is not to the contrary shown, that he did not personally know appellee. He stated that he acted upon the numerous complaints which came to his hands from parties, some employees and many doing business with the appellant, concerning the inability of appellee to properly manage the Seguin office, and stated further:

"I merely concluded that she was not suited for the managership of this office or any other office under my supervision; there would have been no objection to her going to San Antonio and securing employment; so far as I am concerned I would have raised no objection to her doing so, and I have no ill feeling toward her in the matter; in fact, I do not know the lady."

He also stated the appropriation of the $7.50 had nothing to do with his discharging her; it was for unsatisfactory service; that Cline never had anything to do with it, and never reported to him concerning the controversy about the $7.50 light matter; that he had no malice against appellee; and it nowhere appears that he had any; but it is also contended that Wilson by sending over the wires of the company the following message charged a crime against her, and gave great publicity to it:

"D H Co. Dallas, Texas 9 AM
"Oct 15 1920

"Cline, Seguin, Texas:

"Understand Mgr Buchanan took credit for seven fifty light expense Month May June July and appropriated the money which should of course be refunded If approval two fifty per month still shown for lights should it not be canceled understand now covered in lease
"Wilson"

[5] There is nothing in this message that charges a crime; the use of the word appropriate, as sometimes defined, meaning "to take to oneself, in exclusion of others; claim or use, as by an exclusive right; set apart or assign to a particular use." In no sense does that word charge a crime per se, for she applied the money under a claim of exclusive right, and thereby appropriated it in accordance with her understanding, which it was later admitted by her that she had improperly applied, but as promptly refunded. It takes a very extreme construction and a very narrow application of the word "appropriate" to make it mean a criminal charge of embezzlement in the connection in which it was used. The word was used in no such sense or connection for all the expressions made in connection with the use of the words

"misappropriation" or "appropriation" indicate when speaking of her a high regard for her personal and moral character.

[6] The message itself transmitted over the wire from Wilson to Cline showed no criminal charges on its face. It was as said in R. R. v. Edmundson (Tex. Com. App.) 222 S. W. 185:

"A confidential business communication, having in view the interest of the companies and that of the public, through competent and reliable service, and was so treated by Martin and the officers of the express company. It is clear that Martin used only the ordinary and reasonable means of giving effect to the privilege; there being no excessive publication of the information, and nothing in the conduct of Martin or the express company official evidencing an abuse of the occasion by undue publication of the charge."

In discharging appellee as in the Edmundson Case supra, it was shown that Martin had no personal knowledge of Edmundson, just as it is shown here Wilson had none of appellee. Wilson exhibited complaints set out in the statement of facts too lengthy to set out here from various persons and patrons complaining of the unsatisfactory way appellee handled the office in the interest of the public. He was acting in the discharge of a public duty and in the conduct of its own affairs in relieving appellee as manager of the Seguin office.

[7] Malice may be inferred from the falsity of a charge or imputation of a crime, unless the occasion is privileged, but if the occasion is privileged a proper and sufficient reason must be shown repelling the inference of no malice to overcome the presumption that the communication was made in good faith, without malice, and it devolves then upon the libeled party having the burden of proof to overcome this presumption. That portion of the testimony of appellee claimed to show malice has been carefully assorted and set out in appellee's brief. Therefore, to give it its fullest force and effect, we quote the same from the brief:

"Mrs. Buchanan admitted that she did have some trouble with some of the other operators that were not ladies and gentlemen, who told her, 'You go to hell, you fool,' and things like that. But she also testified that she had no trouble with any lady or gentleman. On the day of the alleged slander, September 1, 1920, there was no serious controversy in regard to the $7.50. On this subject she testified: 'But at that time, September 1, 1920, I did not argue with Mr. Cline, and he did not press the matter; no; I did not return the amount at that time.' She further testified: 'It was contrariness and a put-up job in order to get me out and get a man operator in this office, because they wanted a man in the office here, and Mr. Cline himself said, "It would be nice to have a man in here."' In regard to the $7.50 she testified, 'No; I never was in debt to the company, but the company was indebted to me in the sum

of $19.44, and they would not let me have the $19.44 for some time. No; I never did take $7.50 and pay it back to the company. The company owed me money; they owed me $19.44 and took the $7.50 out of my salary. When he checked me out I was not in any way short in my funds; there was an "overage" of $19.44, which they paid back to me, instead of there being any shortage. The $19.44 was the amount due me.'

"Mrs. Buchanan further testified: 'Before Mr. Cline went down to the bank to see my brother I had explained to him there in my office in reference to the $2.50 per month that was taken out for lights, and told him why I did so. I am sure that was before he went to see my brother in the bank, and on the day he went to the bank to see him. Yes, sir; Mr. Cline lectured me in the office in the presence of other people, my customers, there; then he went to see my brother. Again she testified: 'Whatever I showed Mr. Cline on September 1st was undoubtedly the original instructions I had received from the Dallas office with reference to the lights, and those are the instructions which I have been shown here this morning. No, Mr. Cline did not contend with me that I was mistaken about those instructions. We discussed those instructions that day, but I did not refuse to return the $7.50.' Again she testified: 'I also informed Mr. Wilson of Mr. Cline's conduct in the office, and the way he talked to me and treated me there on the 1st of September, and how angry he got. Yes, sir; Mr. Cline did show disregard for me; absolutely he did. He said, "I will have you discharged," and could have heard it in the hotel or anywhere there. I had a message to go to San Antonio, and an operator there by the name of S. D. came to the wire, and I had this message—just one—to send, and he said, "What have you?" and I didn't pay any attention to what he said; I simply wanted to get off my business, and I tried again to send my message, and he said, "What have you?" and I tried again, and the operator got angry, and Mr. Cline was right over me at the time, and he said to me, "Mrs. Buchanan, I will have you removed from this office if you contend for the wire." I said, "You had better see your San Antonio operator; I was trying to send business over the wire and he was trying to introduce a whole lot of foolishness into the business." And Mr. Cline got real angry then, and I had a lot of customers there at the time; Mr. W. E. Koepsel was in there, and others; and Mr. Cline was standing there over me, using that abusive language to me before those customers. So, after Mr. Koepsel finished his money transfer, he went out, and I said, "I think you took a very inopportune time, Mr. Cline, to censure me; I have done nothing to deserve this censure." He said, "I will have you removed immediately." I said, "Well, have me removed if you want to, and send your relief in the morning, and I will not hold the office any longer than the relief comes."'"

The testimony as to Cline's conduct cannot be said to indicate much refinement and chivalrous treatment of a lady. It was in respect to matters perhaps he had the right to criticise appellee, but then only in a respectful way. If he, the agent, had malice

in his heart, there is nothing to show that the corporation ratified it, or acted upon it in discharging her. The testimony is undisputed that in discharging appellee Wilson, acting for appellant, expressly stated Cline had nothing whatever to do with it, but it was upon his own initiative, and for the benefit of the service, and the other reasons given.

Appellant's third assignment of error is:

"The court erred in admitting in evidence, over the objection of defendant, and in refusing to exclude from the jury, the petition of the citizens of Seguin requesting the reinstatement of plaintiff as manager of defendant at Seguin, said petition being dated November 20, 1920, because said evidence was immaterial, irrelevant, self-serving, and not competent to prove any material issue in the case."

[8] To justify the admission of this obviously improper testimony, appellee contends:

"The court did not err in admitting in evidence the petition of the citizens of Seguin requesting the reinstatement of plaintiff as manager of defendant's office at Seguin, as the same petition had previously been submitted to the defendant company, and the said company contended that it had discharged the plaintiff on account of inefficiency, and not on account of malice, and had introduced evidence of certain complaints that had been filed against her, and it was certainly competent in reply to show what had been submitted in her favor. And, as malice can be shown by circumstances, this was a circumstance bearing upon the question of malice."

It would be just as relevant to introduce a letter from Chief Justice Taft or any other person of prominence in this state or elsewhere suggesting the retention of the lady. It makes no difference that the signers of that petition were business men of Seguin having business dealings with her. Such a petition in respect to the retention of an employee may as a suggestion be persuasive to the company, but has no place here. It is a well-known fact that signers to petitions are easily secured, and, if trials in the courts of justice are to be conducted upon ex parte petitions, without the right to swear and cross-examine signers, the fundamental principles of legal procedure would quickly disappear, and chaos and confusion would supplant law and order. Such petitions would have equal or perhaps more influence with juries than the sworn testimony of witnesses. It cannot be said to what extent this petition influenced the jury in their findings and answers to the special issues. So the court erred in permitting it to be read to them as a part of the evidence for any purpose in this case.

From the view we take, the evidence has wholly failed to establish a case entitling appellee to a judgment, and the court should have instructed, as appellant requested, a verdict in its favor. The judgment of the trial court is therefore reversed, and judgment here rendered for appellant.

Judgment is reversed and rendered.