WELLS v. CHILDERS, State Auditor, et al.

No. 32272. Oct. 4, 1945.

Rehearing Denied Nov. 2, 1945.

*165 P. 2d 358.*

Sid White (Hall Rains, of counsel), both of Oklahoma City, for plaintiff.

Randell S. Cobb, Atty. Gen., for defendants C. C. Childers, State Auditor, and A. S. J. Shaw, State Treasurer.

E. L. Mitchell and C. W. King, for defendant Oklahoma Tax Commission.

Robert Burns, attorney in propria persona, of Oklahoma City, for intervener.

OSBORN, J. This is an original proceeding brought in this court by the plaintiff, J. K. Wells, attacking the constitutionality of House Bill No. 518 enacted by the Twentieth Legislature, creating the Governor's Contingency Fund. In the action Robert Burns filed a petition in intervention asserting the unconstitutionality of House Bill No. 518 and also asserting that Senate Bill No. 197 of the Nineteenth Legislature, Session Laws of 1943, p. 328, was unconstitutional for the same reasons as those urged against House Bill No. 518.

The attack by the plaintiff and intervener upon House Bill No. 518 is based upon three grounds: (1) that it violates section 55, article 5, of the Constitution, for the reason that neither the object

of the appropriation nor the sum appropriated are definitely and distinctly stated in the act; (2) that said act is void because it violates article 4 of the Constitution in that it delegates to the Governor legislative power; and (3) that it violates section 59, article 5, of the Constitution. The attack of the intervener upon House Bill No. 518 and also his attack upon Senate Bill No. 197 are based upon the same grounds. Senate Bill No. 197 of the Nineteenth Legislature is almost identical in terms with House Bill No. 518, and we will consider House Bill No. 518 and apply the same reasoning to Senate Bill No. 197 without separately discussing it.

House Bill No. 518 creates a special cash fund to be known as the Governor's Contingency Fund, directs the State Auditor to transfer to said fund all the unincumbered cash in the general revenue appropriation remaining from the Governor's Contingency and Emergency Fund, authorized by Senate Bill No. 197 of the Nineteenth Legislature, and any cash remaining to the credit of allocations made out of the last mentioned fund where the allocation has lapsed, directs the Oklahoma Tax Commission to transfer to said fund the sum of $200,000 from the sales tax token account of said commission, and appropriates out of the general revenue fund the sum of $200,000. Said act in part provides:

"Section 5. The Governor may use and expend any or all of the monies in the Governor's Contingency Fund herein created, to defray expenses arising by reason of contingencies or emergencies for which provision has not been made, including (1) necessary repair or replacement of public buildings destroyed or' damaged by fire, hail, tornado, explosion, or other hazard; (2) emergencies resulting from increase in the cost of food, clothing and maintenance necessary for the operation of any State penal, charitable or eleemosynary institution; (3) for supplemental allocation to the Oklahoma State Regents for Higher Education for emergency needs of the institutions comprising the Oklahoma State System of Higher Edu-

cation; (4) necessary maintenance of the National Guard when released from federal service; (5) necessary augmentation of any appropriation for any State function which may be reduced by reason of a failure in the revenue provided to finance such appropriation; (6) for the purchase of food and clothing, maintenance costs, and payment of salaries at penal and eleemosynary institutions of the State; (7) for the repair and replacement of highways and bridges destroyed or damaged by floods; and (8) any circumstance, condition or situation which, in the judgment of the Governor, requires the expenditure of money for the extraordinary protections of the State and for which expenditures specific appropriation has not been made; but not excluding any other contingencies or emergencies not specifically enumerated.

"Section 6. The Governor may allocate and authorize the expenditure of monies in the Governor's Contingency Fund as may, in his discretion, be necessary to defray any necessary expenses resulting from any contingency or emergency to any State officer, board, department, institution, or commission in defraying expenses resulting from any such contingency or emergency by filing with the State Auditor a certificate setting forth the amount allocated, the purpose for which such amount may be expended, the emergency or contingency requiring the expenditure and such limitations or conditions as the Governor may elect to impose upon the expenditure of such allocation. Upon the filing of such certificate, such officer, board, department, institution or commission shall be authorized to incur obligations and expenses payable out of the Governor's Contingency Fund by complying with the provisions and conditions contained in the certificate of authority. Claims for payment of obligations or expenses incurred pursuant to such authorization shall be paid by the State Auditor by the issuance of warrants out of the Governor's Contingency Fund in the same manner as other claims against the State are paid. If, at any time, a balance remains in any allocation after the contingency or emergency for which the allocation was made has been met,

the Governor may order the cancellation of said balance and revert same to the unallocated amount of the Governor's Contingency Fund. The State Auditor shall keep a separate account of each allocation made by the Governor. The Governor may also incur such obligations and expenses as he may deem necessary by reason of any contingency or emergency and claims for payment of any such expenses or obligations shall, when approved by the Governor, be payable out of said Governor's Contingency Fund in the manner that other claims against the State are paid."

We are not herein concerned with any specific allocation of said funds, the attack being leveled at the act in its entirety.

The principal attack upon the statute is predicated upon the provisions of section 55, article 5, of the Constitution, providing that every law making or reviving an appropriation "shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum."

As to the first requirement above — that it shall distinctly specify the sum appropriated—it appears from the face of the act that the sum appropriated is capable of ascertainment by mathematical calculation, and therefore it is definite and certain within the meaning of said constitutional provision. Edwards v. Childers, 102 Okla. 158, 228 P. 472; Black v. Oklahoma Funding Bond Commission, 193 Okla. 1, 140 P. 2d 740.

As to the second requirement above —that it must distinctly specify the object to which it is to be applied— petitioner contends that it is indefinite and uncertain in that it grants discretionary power to the Governor in the expenditure thereof, and therefore confers upon him legislative power which could not be delegated by the Legislature, and that the act therefore violates article 4 of the Constitution providing for a separation of the powers of government into legislative, executive, and judicial departments, and that neither shall exercise the powers properly belonging to either of the others.

While the Legislature may not delegate to another agency the authority to make laws, it may delegate to another agency the power to make rules and regulations relating to the administration thereof and to determine facts and specific situations to which the general policy of the law as declared by the Legislature applies. Associated Industries v. Industrial Welfare Commission, 185 Okla. 177, 90 P. 2d 899; Gibson Products Co. v. Murphy, 186 Okla. 714, 100 P. 2d 433; Bailey v. State Board of Affairs, 194 Okla. 495, 153 P. 2d 235; Panama Refining Co. v. Ryan, 293 U. S. 388, 55 S. Ct. 241, 79 L. Ed. 446; 42 Am. Jur., Public Administrative Law, sec. 44.

The cases above cited review many authorities from this and other states, and we deem it unnecessary to cite additional authorities upon this point. It is clear that in House Bill No. 518 the Legislature definitely set forth its policy and purpose to protect the state, in the interim between its sessions, from evil effects due to contingencies or emergencies which might happen, and which could not be provided against prior to their occurrence. It legislated upon the subject so far as practicable, and left to the Chief Executive discretion to determine the facts, and apply the provisions of the act to the particular situation. The contingencies which the Legislature anticipated most likely to occur were specially set forth, and the limitation placed on the power of the Governor was that only such sums as were necessary to remedy the mischief caused by them were to be allocated or expended. The same limitation was placed upon those not enumerated, and upon them was placed the further limitation that the fund could be expended only when the protection of the state rendered it necessary. The Legislature created the fund for a public purpose and defined its policy in caring for contingencies

and emergences which were not fore-seeable by it. Considering the total appropriations made by it (about $35,-000,000 for each year of the biennium), the sum appropriated for such purpose constituted a very small percentage of the total, and was not unreasonable in amount when the possible contingencies and emergencies which might come about were envisioned. In fact, the creation of such a cash fund was in keeping with the spirit proclaimed by the amendment to section 23, article 10, of the Constitution, adopted by the people, to require the operation of the state government upon a cash basis.

Since, as stated above, the attack herein is against the act in its entirety and on the specific grounds mentioned, and since we have concluded that the act as a whole does not contravene constitutional authority, and this proceeding not involving any specific allocation, or the action of the Governor in making same, except his total lack of power to proceed thereunder, we shall not consider herein the extent or limits of his authority in acting under the various specific contingencies enumerated, or under the general power set forth in subdivision 8 of section 5 or in section 6 thereof. Much argument is directed by petitioner thereto in presenting his contention that the object and amount of the appropriation are not distinctly specified. Whether or not the Governor, in making a particular allocation, has acted within the purview of the legislative act, or whether or not, in a particular instance, the Governor's authority transcends constitutional restrictions, are questions which can and should be presented when such allocations are made. Any illegal allocations can be halted promptly by the courts at the instance of the state officials or of any taxpayer. It must be assumed, of course, that not only will the Governor be vigilantly careful and circumspect in keeping within the confines of his administrative power, but also that the public officials whose duties embrace the auditing and paying out of such allocated funds will likewise require a strict keeping within the legislative authorization. Such conscientous and scrupulous supervision of the public officials in this respect constitutes a definite answer to most of the arguments thus far presented herein in outlining the possible and direful consequences envisioned by petitioner under the ultimate and broader provisions of the measure. While the power of administration of said fund is capable of easy abuse, yet there is contained in the pleadings and record herein no suggestion of impropriety of any allocations made or contemplated, and the possibility of abuse did not outweigh, in the judgment of the Legislature, the hardship which might arise from unanticipated emergencies for which no provision had been made, or, in the absence of a special session of the Legislature, could be made. The power vested in the Governor is purely administrative, as applied to the object of the appropriation, to be exercised within the limits of the legislative authorization.

Contingency funds, both municipal and state, have generally been recognized and upheld in the various states. See Protest of St. L. & S. F. Ry. Co., 153 Okla. 283, 5 P. 2d 763; People ex rel. Abt v. Bowman, 253 Ill. 234, 97 N. E. 304; Raymond v. Christian, 24 Cal. App. 92, 74 P. 2d 536; Vandegrift v. Riley, 220 Cal. 340, 30 P. 2d 516; Heron v. Riley, 209 Cal. 507, 289 P. 160; Prideaux v. Frohmiller, 47 Ariz. 347, 56 P. 2d 628; State ex rel. Bd. of Regents v. Zimmerman, 183 Wis. 132, 197 N. W. 823; Commonwealth ex rel. Meredith, Atty. Gen., v. Johnson, 292 Ky. 288, 166 S. W. 2d 409; In re Opinion of Justices, 302 Mass. 605, 19 N. E. 2d 807; State Highway Board v. Gates, 110 Vt. 67, 1 Atl. 2d 825.

Plaintiff and intervener rely principally upon the case of Peabody v. Russell, 302 Ill. 111, 134 N. E. 150, 20 A. L. R. 972, in their argument that the object of the appropriation was not sufficiently stated, but we think that case easily distinguishable from the case at bar. The Illinois Constitution

provides that "Bills making appropriations of money out of the treasury shall specify the objects and purposes for which the same are made, and appropriate to them respectively their several amounts in distinct items and sections." The Illinois Legislature attempted to make an appropriation to the department of finance for a reserve fund of $500,000 to be apportioned between the executive, judicial, and military departments of the state by the director of finance with the approval of the Governor. The court held that the fund of $500,000 was not an item in a constitutional sense, but amounted to a lump sum appropriation in which no definite sum was appropriated to any particular or definite purpose and that it violated the Constitution.

We conclude that House Bill No. 518 sufficiently specifies the objects for which said appropriation is to be used, and that it does not contravene said constitutional provision.

Plaintiff also contends that the bill violates section 59 of article 5, providing that where a general law can be made applicable no special law shall be enacted. It clearly appears that House Bill No. 518 is a general law applicable to the whole state, and we consider discussion of this contention unnecessary.

We are not herein determining the propriety of transferring any monies to said fund as provided by section 3 thereof, since a determination thereof is unnecessary herein.

Writ denied.

BAYLESS, WELCH, CORN, and DAVISON, JJ., concur. GIBSON. C. J., HURST, V.C.J., and RILEY and ARNOLD, JJ., dissent.

BAYLESS, J. (specially concurring). In concurring I desire to state that there are several points presented in the dissenting opinion of Mr. Justice Riley that would have my support in actions attacking allocations for particular purposes or specific funds.

There is no express language in the Constitution of Oklahoma granting or denying the power of the Legislature to appropriate for emergencies or contingencies arising during the biennium following the session. The Legislature's general power extends to all rightful subjects of legislation unless expressly restricted, and it seems to me that appropriations designed to take care of emergencies are the rightful subject of legislation. There are many restrictive provisions in our Constitution, climaxed by the amendment to section 23, art. 10, that indicate an over-all scheme to hold our Legislature exclusively responsible for making appropriations and saying how, when, and for what purposes they shall be spent and intending as far as possible to maintain the State of Oklahoma on a cash basis. Nevertheless, it must be recognized that despite the utmost care and effort on the part of the Legislature incidents may transpire between its sessions that require immediate remedy that the Legislature cannot be expected to foresee with any degree of certainty. To deny the Legislature power to provide for these emergencies or contingencies would be to unduly restrict its legislative power.

I am authorized to say that Mr. Justice DAVISON concurs in these views.

GIBSON, C. J. (dissenting). The question presented is not whether the Legislature is clothed with power to enact laws to speedily effect good in event of unforeseen emergencies. That such power exists is beyond question. And, to the extent that need for such legislation exists, there devolves upon the Legislature the duty to so act. But such action, however imperative, must be done within the realm of constitutional authority. Its proper attitude with respect to duty and power is thus declared in Schechter v. United States, 295 U. S. 495, 79 L. Ed. 1570, 97 A. L. R. 947, where emphasis was placed upon the gravity of a crisis:

"Undoubtedly, the conditions to which power is addressed are always

to be considered when the exercise of power is challenged. Extraordinary conditions may call for extraordinary remedies. But the argument necessarily stops short of an attempt to justify action which lies outside the sphere of constitutional authority. Extraordinary conditions do not create or enlarge constitutional power."

A decisive question here is whether the Legislature, cognizant of the need of such legislation and aware of its nonassignable duty to provide therefor, has undertaken, in default of its own performance, to transfer its prerogative in the premises to the Executive. In Schechter v. United States, supra, after reciting the fact of repeated recognition by that court of the power of Congress to adapt its legislation to complete situations "which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply," it was said:

"But we said that the constant recognition of the necessity and validity of such provisions, and the wide range of administrative authority which has been developed by means of them, cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained. Id., 421.

"Accordingly, we look to the statute to see whether Congress has overstepped these limitations, whether Congress in authorizing 'Codes of Fair Competition' has itself established the standards of legal obligation, thus performing its essential legislative function, or, by the failure to enact such standards, has attempted to transfer that function to others."

In Field v. Clark, 143 U. S. 649, 36 L. Ed. 294, the question was whether section 3 of the Tariff Act of October 1, 1890, in authorizing the President to suspend the operation of the provision permitting free introduction of certain articles of commerce, when the exporting country imposed exactions or duties which the President deemed reciprocally unequal and unreasonable, delegated legislative power. The following excerpts from the opinion indicate the tests applied in upholding the section:

"That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution. The Act of October 1st, 1890, in the particular under discussion, is not inconsistent with that principle. It does not, in any real sense, invest the President with the power of legislation . . . Congress itself prescribed, in advance, the duties to be levied, collected, and paid, on sugar, molasses, coffee, tea, or hides, produced by or exported from such designated country, while the suspension lasted. Nothing involving the expediency or the just operation of such legislation was left to the determination of the President. . . . But when he ascertained the fact that duties and exactions, reciprocally unequal and unreasonable, were imposed upon the agricultural or other products of the United States by a country producing and exporting sugar, molasses, coffee, tea, or hides, it became his duty to issue a proclamation declaring the suspension, as to that country, which Congress had determined should occur. He had no discretion in the premises except in respect to the duration of the suspension so ordered. But that related only to the enforcement of the policy established by Congress. As the suspension was absolutely required when the President ascertained the existence of a particular fact, it cannot be said that in ascertaining that fact and in issuing his proclamation, in obedience to the legislative will, he exercised the function of making laws. Legislative power was exercised when Congress declared that the suspension should take effect upon a named contingency. What the President was required to do was simply in execution of the Act of Congress. It was not the making of law. He was the mere agent of the law making department to ascertain and declare the event upon which its expressed will was to take effect. It was a part of the law

itself as it left the hands of Congress that the provisions, full and complete in themselves, permitting the free introduction of sugar, molasses, coffee, tea, and hides, from particular countries, should be suspended, in a given contingency, and that in case of such suspension certain duties should be imposed."

And the tests applied in refusing to uphold the provision of an act in Panama Refining Company v. Ryan, 293 U. S. 388, 79 L. Ed. 446, 456 and 458, are as follows:

"Accordingly, we look to the statute to see whether the Congress has declared a policy with respect to that subject; whether the Congress has set up a standard for the President's action; whether the Congress has required any finding by the President in the exercise of the authority to enact the prohibition. . . .

"The Congress left the matter to the President without standard or rule, to be dealt with as he pleased. The effort by ingenious and diligent construction to supply a criterion still permits such a breadth of authorized action as essentially to commit to the President the functions of a Legislature rather than those of an executive or administrative officer executing a declared legislative policy."

In light of the principles so announced it clearly appears that a legislative enactment is truly such only when it is operative by force of the legislative will expressed therein. Hence, it follows that when an enactment by its terms can become operative only on the election of another, the exercise of such election is the exercise of legislative power.

In State ex rel. Murray, Governor, v. Carter, State Auditor, 167 Okla. 473, 30 P. 2d 700, we said:

"It is a proper exercise of legislative power for the Legislature to make the items of appropriation in an institutional appropriation bill dependent upon the existence of a fact happening or to take effect in the future. There is no efficacy to such items appropriated until it is ascertained that those facts exist; *after such a determination such items then become operative.".*

In the instant case, the law does not become operative when the facts of an emergency or necessity are found by the Governor to exist, but only at the pleasure and election of the Governor.

Furthermore, when the enactment becomes operative as a law it becomes a rule of conduct and it must declare a legislative policy and fix legal principles which operate as a standard. Such legislative pronouncement of policy and principles is as nondelegable as is the discretion to say whether the law shall or shall not have operative force. Express recognition of this doctrine was given by this court in Gibson Products Co. v. Murphy, 186 Okla. 714, 100 P. 2d 453, where it was said:

"The Legislature may not delegate its power to make laws, it must declare the policy and fix legal principles, but other agencies may be invested with power to ascertain facts to which the policy and principles apply, otherwise 'there would be infinite confusion in the laws. . . .'. 1 Cooley, Constitutional Limitations, 228, 8th Ed."

In my opinion, the fact that the Legislative enactment here involved is in its entirety violative of the provisions of the Constitution is so patent on the face thereof as to require no argument to support such conclusion.

There is an utter absence of any legislative prescription that the law is to become operative as such independently of the will of the Governor and there is like absence of any declared policy or principles governing the law's execution other than as may be prescribed by the Governor. On the other hand, both when and how the law is to be operative is expressly committed to the discretion of the Governor. Nor is this grant of legislative authority to be limited in its exercise to divers situations specified in the act, but by subparagraph 8 of section 5 thereof it is made to include "and (8) any circumstance, condition or situa-

tion which, in the judgment of the Governor, requires the expenditure of money for the extraordinary protections of the state and for which expenditures specific appropriation has not been made; but not excluding any contingencies or emergencies not specifically enumerated."

Bearing in mind that "not excluding" as used in the act means the inclusion of "any other contingencies or emergencies not specifically enumerated," the grant of the legislative authority can be characterized by no better language than that of Mr. Justice Cardozo in his concurring opinion in the Schechter Case, supra, as follows:

"Here, in the case before us, is an attempted delegation not confined to any single act nor to any class or group of acts identified or described by reference to a standard. Here in effect is a roving commission to inquire into evils and upon discovery to correct them. . . .

"This is delegation running riot."

The express policy of the act is to give the Governor plenary authority in the legislative field so far as may be necessary to both vitalize the operative force of the act, if by him deemed wise, and, further, to prescribe and effect such of the authorized results as he may determine. These powers necessarily include his power to determine what, if any, emergency shall receive recognition, and which, of two or more, shall receive such recognition, and the amount of the appropriation in every case, and all, of course, in conformity with that standard, if any, his will may prescribe. And, viewed from the standpoint of rights created, an unrecognized victim of an emergency that is clearly within the purview of the act, could have no standing in court to complain unless, perchance, the Governor, solely on his own behest, had established standards, with force of law, that made his own conduct neglectful.

There are other considerations that might be urged both in support of the conclusion reached by me concerning the law as a whole and as a basis for declaring particular sections of the act unconstitutional independently of the matters here discussed. However, such considerations are most ably discussed in the opinion of Mr. Justice Riley, in which I concur fully, and are additional reasons for holding said act unconstitutional.

Since I find in the majority opinion emphasis laid upon the potentialities of the act for good and the unchallenged integrity of the administration thereof by the Governor, facts which though admittedly true I deem unimportant except for the purpose of being excluded from consideration, I think it appropriate to quote the following from the opinion in Panama Refining Co. v. Ryan, supra:

"None of these provisions can be deemed to prescribe any limitation of the grant of authority in sec. 9 (c).

"Fifth. The question whether such a delegation of legislative power is permitted by the Constitution is not answered by the argument that it should be assumed that the President has acted, and will act, for what he believes to be the public good. The point is not one of motives but of constitutional authority, for which the best of motives is not a substitute."

Here, we are concerned with the motives of neither the legislative nor executive departments, but with the operative force of constitutional provisions, and we are deeply concerned with the gravity of the duty now resting upon this court in construing and declaring the mandates thereof on the issue here.

For the foregoing reasons, I respectfully dissent.

HURST, V.C.J., and RILEY and ARNOLD, JJ., concur in these views.

HURST, V. C. J. (dissenting). I concur in the dissenting opinions of the Chief Justice and of Mr. Justice Riley. The authorities cited by them support the conclusion that the making of appropriations for state purposes is tradi-

tionally (59 C. J., States, §§ 341, 382), and by the express terms of our State Constitution (section 55, article 5), purely a legislative function which the Legislature cannot delegate, and that the act violates article 4 of our Constitution, and it also violates section 55, article 5, of our Constitution in four respects: (1) It refers to another statute in fixing part of the sum appropriated, (2) it does not distinctly specify the sum appropriated, (3) it does not distinctly specify the object to which the appropriation is to be applied, and (4) it is made nonfiscal, which means that the appropriation may be expended after the expiration of two and one-half years from the passage of the act. Furthermore, the authorities cited in the majority opinion do not support the reasoning thereof or the conclusion reached, as I shall now briefly point out.

The first two cases cited in the majority opinion (Edwards v. Childers and Black v. Oklahoma Funding Bond Commission) concerned appropriation bills for a specified object, and no discretion to use the money appropriated for different purposes was vested in any executive officer in the acts there under consideration, as in the act here involved.

The next authorities cited in the majority opinion do not deal with the validity of appropriation bills. Rather, they deal with the right of the Legislature to delegate administrative duties to executive officers by laying down a sufficient standard to guide the officers in administering the law. Bailey v. State Board of Affairs, 194 Okla. 495, 153 P. 2d 235, had to do with the executive function of caring for the wards of the state and spending the appropriations made for that purpose. The other authorities concerned the police power and the due process clause. They all recognize that the Legislature cannot delegate true legislative power, such as the power to make a law.

The authorities last cited in the majority opinion dealt with appropriations.

The first two (Protest of St. L. & S. F. Ry. Co. and People v. Bowman) had reference to municipal appropriations, and are not in point, since section 55, art. 5, of our Constitution and the like provision of the Illinois Constitution relate only to appropriations by the Legislature, not to municipal appropriations made by the local officers. The other cases by the courts of Arizona, California, Kentucky, Massachusetts, Vermont, and Wisconsin involved appropriation bills under constitutional provisions which do not require that appropriation bills distinctly specify the amount of the appropriation or the object to which it shall be applied, as in Oklahoma. The California Constitution (art. 4, sec. 22) requires only that "no money shall be drawn from the treasury but in consequence of appropriation made by law." The provisions of the Constitutions of Kentucky (sec. 230), Massachusetts (Part 2, ch. 2, § 1, art. 11), Vermont (sec. 27, ch. 2), Wisconsin (sec. 2, art. 8), and of many other states, as well as of the United States (article 1, sec. 9 (7)), are very similar to the quoted California provision. On the other hand, seven states have constitutional provisions very similar to section 55, art. 5, of our Constitution. See Arkansas, section 29, art. 5; Illinois, section 16, art. 5; Louisiana, section 10, art. 4; Maryland, section 32, art. 3; Missouri, section 19, art. 10; New Mexico, section 30, art. 4; New York, section 21, art. 3. In the Kentucky, Massachusetts, and Wisconsin cases cited in the majority opinion attention is called to the fact that some states have constitutional provisions requiring that legislative appropriations be definite as to amount and purpose. Thus, the Kentucky court (292 Ky. 288, 166 S. W. 2d 409) said:

"While some of our sister states' Constitutions contain provisions prescribing the form and extent to which appropriations shall be detailed and specified, a great many states, like our own, have no restrictions in that respect."

The Massachusetts court (302 Mass. 605, 19 N. E. 2d 807) said:

"Cases arising in other jurisdictions under constitutional provisions in different form furnish little aid in interpreting the provisions of the Constitution of this commonwealth. See, for example, Peabody v. Russell, 302 Ill. 111; State v. Carter, 167 Okla. 32."

And the Wisconsin court (183 Wis. 132, 197 N. W. 823) said:

"In the states of North Dakota, Arkansas, Oklahoma, and South Dakota there are constitutional provisions that appropriations must be specific, or there are other provisions imposing conditions not found in our Constitution."

The clear inference is that the courts of Kentucky, Massachusetts, and Wisconsin would not have sustained appropriations for contingency and emergency purposes if their Constitutions had contained provisions similar to section 55, art. 5, of our Constitution.

The attempt of the majority to distinguish the Illinois case, Peabody v. Russell, 302 Ill. 111, 134 N. E. 150, 20 A. L. R. 972, is not effective. That case is contrary to the majority opinion, and properly construes and enforces the Illinois constitutional provision requiring that appropriation bills "specify the objects and purposes" for which the items of appropriation are made, and holds in effect that "emergencies" do not constitute a specified "object and purpose." And the annotator was of this view.

I do not find where, in any of the other states having constitutional provisions like ours, an omnibus appropriation for contingency and emergency purposes to be expended for more than one purpose at the will of executive officers has been considered. However, the reasoning of the courts of some of those states would seem to condemn such an act. See People v. Board of Supervisors, 52 N. Y. 556; People v. Tremaine, 252 N. Y. 27, 168 N. E. 817; State v. Seibert, 99 Mo. 122, 12 S. W. 348; Dickinson v. Clibourn, 125 Ark. 101, 187 S. W. 909; Arkansas Game and Fish Comm. v. Page, 192 Ark. 732, 94 S. W. 2d 107; McAdoo Petroleum Corp.

v. Pankey, 35 N. M. 246, 294 P. 322; Gamble v. Velarde, 36 N. M. 262, 13 P. 2d 559.

For other authorities dealing with this question, see 59 C. J. 248-251; 42 Am. Jur. 744-749.

The certificate of the Governor making each allocation "setting forth the amount allocated, the purpose for which such amount may be expended, the emergency or contingency requiring the expenditure and such limitations or conditions as the Governor may elect to impose upon the expenditures of such allocation" constitutes the act of appropriation—the setting apart of a specific amount for a specific purpose —which is a non-delegable legislative function.

For the foregoing reasons, I think the majority opinion is not only contrary to the plain language of our Constitution, but is not supported by the authorities relied upon, and I respectfully dissent.

The Chief Justice and Justices RILEY and ARNOLD concur in these views.

RILEY J. (dissenting). This is an original proceeding attacking the constitutionality of H. B. 518 enacted by the 20th Legislature, creating the Governor's Contingency Fund, and seeking to restrain expenditures from the fund.

The appropriation is assailed on the ground that the act delegates legislative power to the Governor, in violation of article 4 of the Constitution, which reads:

"The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in the Constitution, the Legislative, Executive, and Judicial Departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

Section 1 of the act creates a special cash fund in the office of the State

Treasurer, to be known as the Governor's Contingency Fund, to be composed of such cash and appropriations as may be determined by the Legislature, to be disbursed for such purposes and in such manner as may be prescribed by the Legislature. Sections 2, 3, and 4 of the act prescribe the sources from which said fund will be derived. Section 5 authorizes the Governor to use and expend any or all of the monies in said fund to defray expenses arising by reason of contingencies or emergencies, including seven specified purposes, and authorizes the Governor to use and expend any or all of said monies under any circumstances, conditions, or situations which, in the judgment of the Governor, require the expenditure of money for extraordinary protection of the state for which specific appropriation has not been made, "not excluding any other contingency or emergency not specifically enumerated."

Section 6 of the act gives the Governor unlimited authority to allocate and authorize the expenditure of the monies in the fund as in his discretion might be necessary to defray any necessary expenses resulting from any contingency or emergency, to any state officer, board, department, institution, or commission in defraying expenses resulting from any such emergency or contingency, and prescribes the procedure to be followed in making such allotment. Thus power is sought to be given the Governor to determine what shall constitute a contingency or emergency in addition to those by the Legislature enumerated in section 5.

Power to make laws is legislative and may not be delegated by the Legislature to the executive or judicial departments of the state government. Art. 5, sec. 56; art. 6, sec. 12, Const. of Okla. "Appropriation", as used in the Constitution, denotes the setting apart or assigning to a particular use a certain sum of money for specified purposes in such manner that public officials are authorized to draw and use the sum so

set apart, and no more, for the purpose specified, and none other. Dickinson v. Clibourn, 125 Ark. 101, 187 S.W. 909; State v. Moore, 50 Neb. 88, 69 N. W. 373.

An appropriation in this state is a legislative authority, given at the proper time and in legal form to the proper officer, to apply a distinctly specified sum, from a designated fund out of the treasury, in a given year, for a specified object or demand against the state. Menefee v. Askew, 25 Okla. 623, 107 P. 159.

The Legislature must not only, by law, set apart the money, but every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied. Article 5, sec. 55, Const. Each of these specified purposes must be a part of the law making the appropriation and each must be by the Legislature. This is a duty that cannot be delegated. Smithberger v. Banning, 129 Neb. 651, 262 N.W. 492, 100 A.L.R. 686; State v. Wetz, 40 N. D. 299, 168 N.W. 835.

The Legislature must determine to what objects and purposes money of the state shall be appropriated and cannot bestow that power upon any person or board for the exercise of discretion of the donee as to the objects for which the money shall be expended. People v. Brady, 227 Ill. 124, 115 N. E. 204; 16 C.J.S. 377; Re County Com'rs of Counties Comprising the 7th Judicial District, 22 Okla. 435, 98 P. 557.

Under these authorities, that part of section 5 which purports to authorize the Governor to use and expend said fund under "any circumstance, condition, or situation, which in the judgment of the Governor requires expenditure of money for the extraordinary protection of the state and for which expenditures specific appropriation has not been made, but not excluding any other contingencies or emergencies not specifically enumerated," and all that part of section 6 which empowers the Governor to al-

locate and authorize the expenditure of monies in said fund as may in his discretion be necessary to defray any necessary expenses resulting from any contingency or emergency, to any state officer, board, etc., by a certificate setting out the amount allocated and the purpose for which such amount may be expended, and setting out the supposed emergency or contingency requiring the expenditure; and all that part of section 6 which reads:

"The Governor may also incur such obligations and expenses as he may deem necessary by reason of any contingency or emergency and claims for payment of any such expenses or obligations shall, when approved by the Governor, be payable out of said Governor's Contingency Fund in the manner that other claims against the State are paid."

—are all utterly void as an unconstitutional delegation of the legislative power.

This leaves some seven purposes specified in section 5 of the act for consideration. Incidentally, it may be noted that number 5 is clearly prohibited by the provisions of section 23, art. 10, of the Constitution, as amended, which, among other things, provides that after June 30, 1941, that portion of every appropriation at the end of each fiscal year, in excess of the actual revenue collected and allocated thereto, shall be null and void, and the further provision that any department, institution, or agency of the state operating on revenue derived from any law or laws which allocate the revenues thereof to such departments, institutions, or agencies, shall not incur obligation in excess of the unencumbered balance of surplus cash on hand. Said section clearly contemplates, and requires the Legislature to provide, that all appropriations shall be reduced so as to bring them within revenues actually collected. The appropriation being automatically reduced to conform to the amount of revenue actually collected, to permit the Governor to allocate and authorize the expenditure of any addi-

tional amount as provided in purpose number 5 in section 5 of the act is to give to the Governor power to appropriate money, which is clearly a legislative power which cannot be delegated. Objections might be pointed out as to other specified purposes, but we deem it unnecessary to discuss them. All of section 5 is objectionable for the same reason of unlawful delegation of legislative power. It gives the Governor unlimited power to use all or any part of the total appropriation for any one of the seven specified purposes. Likewise, it gives the Governor power to use any part of the appropriation for any one of the seven specified purposes.

In State v. Budge, 14 N.D. 532, 105 N.W. 724, the court had under consideration an act of the Legislature which provided for the appointment of a Board of Capitol Commissioners consisting of three persons, with power in said board to make a contract for the remodeling and reconstruction of the State Capitol and for the erection of a Governor's residence. The act detailed how the funds should be provided, the aggregate amount being $600,000. The commission was given unlimited discretion as to what the residence should cost and what the Capitol should cost, limited, of course, to $600,000 for both. The validity of the act was challenged in an action to enjoin the commissioners from proceeding thereunder. In the opinion, the court said:

"The commission has absolute power under this law to fix the limits of the cost of each of said buildings. They finally determine what sums shall be used for each building. We think that such discretion should have been exercised by the Legislature. It is not properly an administrative discretion. What the several buildings shall cost should have been limited by the act, as it is a substantive matter of legislative discretion that the Legislature cannot delegate."

So with the act here involved. The Governor is given unlimited discretion to use and expend any or all of the money in the fund for any one of seven

specified purposes. Or he may, in his discretion, allot said money to two or more of said purposes. Or, he may, in his discretion, disregard all the seven purposes specified by the Legislature and allot all the money to any state officer, board, department, institution, or commission, or to any two or more of them, upon his determination of the existence of an emergency requiring the expenditure of the money so allotted. Or, finally, the Governor may, under the act, incur such obligations and expenses as he may deem necessary by reason of any contingency or emergency. The discretion and judgment to be used in these matters are purely and clearly legislative power and cannot properly be delegated to persons or boards. State v. Budge, supra; Lingo-Leeper Lbr. Co. v. Carter, 161 Okla. 5, 17 P. 2d 365.

The act is challenged as being violative of the provisions of article 5, section 55, Constitution, in that the sum sought to be appropriated as well as the object of its application is not distinctly specified in the act. By terms of the act, to constitute the fund, in addition to an appropriation from the general revenue fund of the state and a transfer from the sales tax token account, there is sought to be reappropriated from the general revenue fund the unencumbered balance and lapsed portion of the Governor's Contingency and Emergency Fund for the previous biennium, and to this end, reference is made in section 2 of the act to S. L. 1943, p. 328. What is the total sum appropriated? The act does not say, but the mandate of the Constitution is "Every such law making . . . an appropriation shall distinctly specify the sum appropriated . . ." It is urged, however, that the sum appropriated is a fact capable of ascertainment by mathematical calculation independent of the act and therefore under the theory "That is certain which can be reduced to certainty," the constitutional requirement is satisfied and fulfilled.

In Meyer v. Clift, 31 Okla. 793, 123 P. 1042, this court was of a different view. Therein it was said:

"It has been urged that the amount necessary is a question of fact only which may be determined independent of the act. In this we cannot concur. If the Constitution prohibits the Legislature from fixing the amount the act appropriates, by reference to any other law, the court cannot do indirectly what the Legislature is prohibited from doing directly . . . . The sum that the Legislature may appropriate by any act must be a fixed sum." 59 C. J. 249; McAdoo Petroleum Corp. v. Pankey, 35 N. M. 246, 294 P. 322; State v. Moore, 50 Neb. 88, 69 N. W. 373; Lepanto Spec. School Dist. v. Cone, 176 Ark. 1178, 5 S. W. 2d 332; Oliver v. Bolinger, 146 Ark. 242, 225 S. W. 314; Westinghouse E. & M. Co. v. Chambers, 169 Cal. 131, 145 P. 1025; Fergus v. Russel, 270 Ill. 304, 110 N. E. 130; Anno. Cas. 1916B, 1120; Peabody v. Russel, 302 Ill. 111, 134 N. E. 150, 20 A. L. R. 972.

In view of the provision (art. 5, sec. 55, Const.) that "It shall not be sufficient for such law to refer to any other law to fix" the sum appropriated, it is inferred that resort may not be had to any source other than the appropriating act to ascertain the sum appropriated. The inference becomes a certainty when consideration is given to the constitutional mandate "Every such law making . . . an appropriation shall distinctly specify the sum appropriated . . ." In view of the fact that section 2 of the act does not distinctly specify the sum appropriated, the appropriation to that extent fails.

Independent of failure of section 2 of the act to specify the sum sought to be appropriated as a material or major portion of the fund, was there an appropriation? Why is the chief executive officer not left to his own discretion in the use of public revenues? What is meant by the constitutional inhibition upon the executive power? History answers these questions. These restraints are contained in Constitutions of all the states and in the Constitution of the United States. They are imposed by paramount law to guard against the abuse of power. They were

derived from historical documents enunciating fundamental principles, among which was that the king or executive department should not use money in the treasury except as specifically appropriated. Theretofore the king levied and expended public revenues by his own authority, and at his own will made application of public funds to such claims as he chose and to the neglect of others, and so he became independent of the people and, as a matter of course, tyrannical and wasteful in administration. 1 Black Comm. ch. 8. Public funds were then used where selfgratification, favoritism, and corruption could be best accomplished while just demands upon the treasury were left unpaid. Ristine v. State, infra. The result, according to Macauley, was plunder and the public revenues were wasted in extravagance and corruption until it was determined no longer to vote to the Crown revenue in lump sums to be applied to purposes according to royal discretion.

To guard against such abuse, effective sovereignty was then transferred from the Crown to the Parliament through the medium of enunciating a fundamental principle that "No money shall be drawn from the treasury but in pursuance of an appropriation by law". The principle is a part of our basic law extended as it is by words of the inhibition. The abuse to be avoided by the principle is exercise of official discretion in the expenditure of public funds. By it the Legislature alone is given the right and upon it is imposed the duty of designating periodically the particular demand, the object and the public purpose to which money in the treasury shall be applied and the amount of each application. Objects stated in several to which a fund of the state may be applied do not constitute an appropriation. The problem should be settled upon meaning of the Constitution. The words of that instrument require, in this respect, no interpretation. They are quite plain so as to require a legislative allocation of definite sums of money to a specific object or purpose as authority to disburse funds.

Assuming the limitation contained in our constitutional provision is not the rule by which an appropriation is measured, surely then there is reversion by the act under consideration to official discretion such as was abrogated in the English Revolution of 1688 and which it was undoubtedly the design of our Constitution to abrogate here.

Our conclusion is not without consideration of Edwards v. Childers, 102 Okla. 158, 228 P. 472, and Black v. Oklahoma Funding Bond Com., 193 Okla. 1, 140 P. 2d 740, wherein the rule of the Edwards-Childers case is applied without further examination. The decision in Edwards v. Childers, supra, sustains an appropriation consisting of an excise tax on gasoline, the whole of which was devoted to construction and maintenance of state highways. The rule therein stated was restricted by paragraph 4 of the syllabus to an appropriation of an entire fund for a particular purpose "from sources not coming from, or out of, the general revenue of the state". As indicated in Meyer v. Clift, supra, and by the opinion announcing the doctrine, it is thought the rule should not be extended.

"The primary object of the provisions of the Constitution . . . is to prevent the expenditure of the people's money without their consent, expressed in the organic law or constitutional acts of the Legislature." Dickinson v. Clibourn, 125 Ark. 101, 187 S. W. 909.

"The abuse to be corrected by the establishment of the principle was the exercise of official discretion in paying out the public money." Ristine v. State, 20 Ind. 328.

"The object of the Constitution . . . is to prevent expenditures of public funds at the will of those who have them in charge . . . ". State v. Clausen, 94 Wash. 166, 162 P. 1.

In consequence of this view, it is the mandate of the Constitution that no

money shall be paid out of the treasury of the state except in pursuance of an appropriation by law, and that an appropriation by law may not be made unless the law providing for expenditures from the general revenue fund of the state shall distinctly specify the sum appropriated and the object of its application.

The writ should be granted.

GIBSON, C.J., HURST, V.C.J., and ARNOLD, J., concur.