Dear Senator Robert M. Kerr
¶ 0 This office has received your request for an Attorney General Opinion addressing, in effect, the following questions:
1. May the states of Oklahoma and Texas enter an agreementthat allows each state to exercise sovereignty over lands thatpreviously were under the control of the other state, as proposedin the 47th Oklahoma Legislature's Enrolled Senate Bill 175, § 2,to be codified at 74 O.S. Supp. 1999, § 6106[74-6106]?
2. If states may exchange sovereign territory, may they allowlandowners in the exchanged territory to retain property rightsgranted by the original state if such property rights are notheld by other citizens similarly situated in the receiving state,as proposed in S.B. 175, § 2, to be codified at 74 O.S. Supp.1999, § 6106[74-6106]?
3. May the State of Oklahoma delegate to an Oklahoma Red RiverBoundary Commission designee the power to negotiate with theState of Texas on the exact location of the boundary betweenOklahoma and Texas without requiring subsequent legislativeapproval of the negotiated agreement, as provided in S.B. 175, §§2 and 3, to be codified at 74 O.S. Supp. 1999, §§ 6106[74-6106] and6107?
 4. May the United States Congress ratify the proposed borderagreement between the states of Oklahoma and Texas in S.B. 175, §2, to be codified at 74 O.S. Supp. 1999, § 6106[74-6106], since it issubject to modification and incorporation of a subsequentagreement without legislative or congressional approval?
¶ 1 Residents of the areas now known as Texas and Oklahoma have disagreed over the boundary between them for almost two centuries. A treaty between the King of Spain and the United States of America in 1819 set the original border along Oklahoma's southernmost connection with Texas as the south bank of the Red River.[1] Ever since that time, through relations between and among Spain, Mexico, the Republic of Texas, the United States, the State of Texas, Indian Territory, Oklahoma Territory, and the State of Oklahoma, the parties have argued about where the river's south bank is — even to the point of arguing about which stream is the Red River.
¶ 2 Shortly after Oklahoma's statehood and a full century after the original border-making treaty, Oklahoma sued Texas in the United States Supreme Court to settle the question of where the Red River boundary between the two states lay. More than a decade of litigation and in excess of two dozen court opinions followed, ostensibly settling the matter. It did not. The states continue to have difficulty applying the treaty, statutes, and court rulings "on the ground." In an attempt to resolve the matter, the states created the Red River Boundary Commission.[2] The Commission's work culminated in passage during the most recent Oklahoma and Texas legislative sessions of a proposed interstate agreement or compact concerning the border. In Oklahoma's 47th Legislature, that legislation was Senate Bill 175. In Texas's 76th Legislature, that legislation was House Bill 1355 as amended by House Bill 1587.
¶ 3 Pursuant to the Interstate Compact Clause, U.S. Const. art. I, § 10, cl. 3, the two states are preparing to submit their agreement to the United States Congress for approval.
 Cession of State Sovereignty
¶ 4 With such congressional approval, states may adjust their boundaries with one another and in that adjustment cede sovereignty over territory they once controlled or gain sovereignty over territory they did not previously control. SeeNew Jersey v. New York, 523 U.S. 767, 118 S. Ct. 1726, 1750
(1998). In fact, a written agreement between the states is not necessary for an exchange of sovereignty over certain territory. If a state openly exercises control over a parcel of land under an adjoining state's sovereignty for an extended period, that territory may come under the encroaching state's sovereign control by prescription, so long as Congress ratifies the action.New Jersey, 523 U.S. at ___, 118 S. Ct. at 1738.
¶ 5 By its own terms, the boundary agreement contemplated by Oklahoma and Texas requires congressional approval. 74 O.S.Supp. 1999, § 6106[74-6106] (Article VIII).[3] If an exchange of territory takes place between Oklahoma and Texas as a result of the agreement, then the only mandatory condition is met by the provision requiring congressional approval. The answer to your first question, therefore, is yes, the states of Oklahoma and Texas may enter an agreement that allows each state to exercise sovereignty over lands that were previously under the control of the other state.
 Effect on Private Property Rights
¶ 6 When a state cedes sovereignty over territory to another state, the affected private property owners' "rights of property remain undisturbed." Langdeau v. Hanes, 88 U.S. (21 Wall.) 521, 527 (1874). Explaining the lack of effect on private property rights when sovereignty changes, the United States Supreme Court said:
 [B]y the cession of territory from one State to another[,] public property and sovereignty alone pass, and . . . private property is not affected. Even in cases of conquest, as Mr. Chief Justice
Marshall observes in U.S. v. Percheman, 7 Pet. 51, 87, it is unusual for the conqueror to do more than to displace the sovereign and assume dominion over the country, and the sense of justice and right, which is felt by the whole civilized world, would be outraged if private property should be generally confiscated and private rights annulled. "The people," continues the Chief Justice, "change their allegiance; their relation to their ancient sovereign is dissolved, but their relations to each other and their rights of property remain undisturbed. If this be the modern rule, even in cases of conquest, who can doubt its application to the case of an amicable cession of territory?"
Langdeau, 88 U.S. (21 Wall.) at 527 (italics in original).
¶ 7 The proposed agreement between Oklahoma and Texas recognizes this rule of law:
This compact does not change:
 1. The title of any person or entity, public or private, to any of the lands adjacent to the Red River;
 2. The rights, including riparian rights, if any, of any person or entity, public or private, that exist as a result of the person's or entity's title to lands adjacent to the Red River; or
3. The boundaries of those lands.
74 O.S. Supp. 1999, § 6106[74-6106] (Article VII).
¶ 8 Landowners in the exchanged territory retain their private property. This retention of private property rights is proper.
 Approval of Modifiable Agreement
¶ 9 Answers to your third and fourth questions — whether the states can delegate power to modify the agreement and whether Congress may approve a modifiable agreement — involve consideration of similar matters. The issues are discussed together.
 Differences Between Versions Not Fatal
¶ 10 Inherent in your questions is an assumption that Oklahoma and Texas have not passed identical forms of the proposed boundary agreement. The face of the two states' legislation shows the legislatures passed different wording. Have the states actually agreed then?
 Minor Differences
¶ 11 While the Oklahoma and Texas legislatures did not pass precisely the same wording when enacting the proposed boundary agreement, for the most part, the differences are miniscule and matters of form rather than substance. For example, in Oklahoma's version the proposal refers to "Oklahoma and Texas," while in Texas's version, the wording is "Texas and Oklahoma." See,e.g., 74 O.S. Supp. 1999, § 6106[74-6106] (Article I[A]) and 76th Texas Legislature Enrolled House Bill 1355, § 12.002 (Article I[a]).[4] Oklahoma uses "sovereignty rights" where Texas employs "sovereign rights." See, e.g., 74 O.S. Supp. 1999, §6106[74-6106] (Article III) and Texas § 12.002 (Article III). Each state refers to other portions of the proposed agreement according to its own statutory reference scheme. See, e.g., 74 O.S. Supp. 1999, § 6016[74-6016] (Article II[D]) and Texas § 12.002 (Article II[d]).[5]
¶ 12 These and similar instances do not constitute substantial differences. One state's highest court has said that a proposed interstate agreement needs only to be "ascertainable." Opinionof Justices, 184 N.E. 2d 353, 357 (Mass. 1962). Minor differences between Texas's and Oklahoma's versions do not make their agreement uncertain. Courts have been able to ascertain the states' agreements even when nothing has been written and their compact existed solely through cooperative actions. See SafeHarbor Water Power Corp. v. Federal Power Comm'n, 124 F. 2d 800,808 (3d Cir. 1941). Obviously, when one state obtained sovereignty over another state's territory by prescription as discussed above, the "agreement" was ascertained without the aid of a written compact. Here, transpositions and inconsequential wording differences would not defeat an understanding of Texas and Oklahoma's agreement.
 Potentially Major Differences
¶ 13 The proposed boundary agreement recognizes that the current border between Oklahoma and Texas is the "south bank of the Red River" and notes the difficulty of identifying this boundary on the ground. 74 O.S. Supp. 1999, § 6106[74-6106] (Article I[A][2] and [3]). In an attempt to settle the decades-long dispute caused by this difficulty, the agreement proposes to recast the boundary outside the Lake Texoma area from the south bank of the Red River to "the vegetation line along the south bank of the Red River." 74 O.S. Supp. 1999, § 6106[74-6106] (Article II[B]).
¶ 14 For the boundary agreement within and immediately adjacent to Lake Texoma, the Oklahoma and Texas legislatures passed differently worded proposals. The Oklahoma Legislature's provision reads as follows:
 From Shawnee Creek to Denison Dam, this boundary line is within the current channel of the Red River. The boundary line from Shawnee Creek to the Denison Dam may be established using the Lake Texoma Fishing and Boating Map, No. A353, published by "FHS Maps" . . ., containing acknowledgments for the data source to the United States Geological Survey and the U.S. Army Corps of Engineers, hereinafter referred to as "Reference Map". From the east bank of Shawnee Creek to the base of the Denison Dam, the boundary between the State of Oklahoma and the State of Texas may be the line which is depicted by the Reference Map as an extension of a black dashed line . . . east from the body of Lake Texoma across the depiction of the Denison Dam, thence continuing eastward until the line connects to a point at the intersection of the east bank of Shawnee Creek and the south bank of the Red River. Within Lake Texoma, this boundary line follows the south bank of the Red River as the bank was located and marked by the United States Army Corps of Engineers [. . .].
74 O.S. Supp. 1999, § 6106[74-6106] (Article II[C]). Italics indicate language in the Oklahoma version missing from the Texas version. The symbol [. . .] indicates language in the Texas version left out of the Oklahoma version.
¶ 15 The Texas Legislature's version of the proposal reads as follows:
 From Shawnee Creek to Denison Dam, this boundary line is within the current channel of the Red River. [. . .] Within Lake Texoma, this boundary line follows the south bank of the Red River as the bank was located and marked by the United States Army Corps of Engineers before the commencement of the construction of Lake Texoma.
Texas § 12.002 (Article II[c]). The symbol [. . .] indicates language in the Oklahoma version left out of the Texas version. Italics indicate language in the Texas version missing from the Oklahoma version.
¶ 16 While the two versions appear in different language, they do not convey different meanings. The basic rule of statutory construction is to give effect to the legislature's intention.See Jackson v. Independent School Dist. No. 16 of Payne County,648 P. 2d 26, 29 (Okla. 1982). A fair reading of both versions shows the legislatures intended the Oklahoma-Texas line in the Texoma area to be the border that existed before Lake Texoma was built — the south bank of the Red River. Oklahoma's version merely identifies the map to use to demarcate that boundary.
¶ 17 The other potentially major difference between the two versions occurs in the same section. Both versions of the agreement contain a directive to the appropriate state officials to "prepare a map of the boundary line." 74 O.S. Supp. 1999, §6106[74-6106] (Article II[D][2]) and Texas § 12.002 (Article II[d][2]). Then, Oklahoma's version reads as follows:
 Within one year after the date the United States Congress consents to this compact, [the parties] shall:
. . . .
 (3) Prepare a document styled "Lake Texoma Area Boundary Agreement", which shall incorporate by reference and have attached as an exhibit a map of the boundary in the Lake Texoma area. Upon agreement, signature and acknowledgment by both [negotiators], the "Lake Texoma Area Boundary Agreement" shall have the legal effect of establishing the boundary within the Lake Texoma area. The "Lake Texoma Area Boundary Agreement", when adopted pursuant to a resolution of the Contingency Review Board acting on behalf of the State of Oklahoma and when adopted pursuant to the applicable requirements of laws of the State of Texas, shall amend the provisions of the Red River Boundary Compact and constitute part of the terms of the Red River Boundary Compact. The governors of the respective party states shall file the "Lake Texoma Area Boundary Agreement" in the state library and archives of each party state and with the Oklahoma Secretary of State [. . .].
 74 O.S. Supp. 1999, § 6106[74-6106] (Article II[D]). Italics indicate language in the Oklahoma version missing from the Texas version. The symbol [. . .] indicates language in the Texas version left out of the Oklahoma version. Underlining indicates use of a different term between the two versions.
¶ 18 The corresponding Texas provision reads:
 Within one year after the date the United States Congress consents to this compact, [the parties] shall:
. . . .
 (3) [. . .] file the map in the state library and archives of each party state and with the Oklahoma Secretary of State, after which the map will be a part of this compact.
Texas § 12.002 (Article II[d]). The symbol [. . .] indicates language in the Oklahoma version left out of the Texas version.Underlining indicates use of a different term between the two versions. Italics indicate language in the Texas version missing from the Oklahoma version.
¶ 19 Again, the words are different, but a fair reading of the versions shows the meaning is the same. The states will devise a map showing where the Texoma area boundary is. Oklahoma insists that this document will be called the "Lake Texoma Area Boundary Agreement." By implication, Oklahoma seems to require a verbal description of what appears on the map. Texas merely calls for a map.
¶ 20 Each of these potentially major differences is inconsequential, especially when the parties understand that constitutional law recognizes a difference between establishing
a boundary and drawing a line on a map to show where an existing boundary is. The establishment of a new boundary between two states requires congressional approval. Virginia v. WestVirginia, 78 U.S. (11 Wall.) 39, 55 (1870). An agreement merely to draw the line does not require congressional approval. NewHampshire v. Maine, 426 U.S. 363, 369-70 (1976) (When former decree set boundary as "Mouth of Piscataqua River," "Middle of the River," and "Middle of the Harbour," agreement between states as to where the mouth and middle of river and the middle of harbor were was not an agreement requiring congressional approval.)
 Delegation of Power to Modify
¶ 21 By its own terms, the proposed boundary agreement gives the two states' administrative officials power only to draw the Texoma area boundary line and to add the map and perhaps a description of that line to the agreement. 74 O.S. Supp. 1999, §6106[74-6106]. The proposed agreement does not give the administrative officials power to establish a new border for the Texoma area. Modification of the agreement to reflect the newly drawn line does not require congressional approval because it does not affect the political power of the United States. See Virginia v.Tennessee, 148 U.S. 503, 519 (1893). Furthermore, Congress may approve a proposed interstate compact despite inclusion of contingencies for future action by the states. See WestVirginia, 88 U.S. (11 Wall.) at 55.
¶ 22 Other legislation accompanying the proposed agreement gives each state's administrative officials the ability to negotiate implementation of the agreement:
 If the State of Texas enters into the Red River Boundary Compact in substantially the form provided in Section 2 [74 O.S. Supp. 1999, § 6106[74-6106]] of this act, the designee of the Oklahoma Red River Boundary Commission has the authority to negotiate with the appropriate Texas representative to resolve any differences between the States of Oklahoma and Texas regarding matters covered by the compact[.]
74 O.S. Supp. 1999, § 6107[74-6107](A).
¶ 23 This provision assumes that each state's legislature will have set policy concerning the boundary agreement as it requires the agreement to be passed "in substantially the form" passed by the other state. As shown above, such passage has occurred. The differences between the two states' acts are inconsequential matters of wording and detail of direction about maps to use. Section 6107 does not contemplate any modification of the agreement establishing the boundary outside the Texoma area as the vegetation line along the Red River's south bank, and it does not contemplate modification of the agreement retaining the boundary within the Texoma area at the river's south bank. The contemplated modifications, therefore, do not require congressional approval.
¶ 24 The answer to your fourth question, therefore, belies the question's assumption that a constitutionally meaningful modification may take place. Insofar as any modification merely shows where the boundary is on the ground rather than establishes the border, congressional approval is not required. The modifications contemplated by the legislation are of a clerical and administrative nature. Congress may approve the proposed boundary agreement because it is ascertainable.
 Legislative Approval of Agreement Modification
¶ 25 After the legislature sets policy, it may delegate administrative details to executive branch officials. City ofSand Springs v. Department of Pub. Welfare, 608 P. 2d 1139, 1144
(Okla. 1980). This delegation may include fact-finding and the determination of how to apply legislative policy to specific situations. Wells v. Childers, 165 P. 2d 358, 360-61 (Okla. 1945). Such delegation is proper so long as the legislature sets out definite standards for the administrative official to follow.Democratic Party of Okla. v. Estep, 652 P. 2d 271, 277-78
(Okla. 1982).
¶ 26 Here, the legislatures of both states delegate to administrative officials the task of determining where the new border is on the ground outside the Lake Texoma area, i.e., drawing the line. The legislatures have set the policy that the boundary is "the vegetation line along the south bank of the Red River." 74 O.S. Supp. 1999, § 6106[74-6106] (Article II[B]). They have given the standard to be used by the administrative officials by defining the terms "vegetation" and "vegetation line."
As used in this article:
 1. "Vegetation" means trees, shrubs, grasses, and other plant species that substantially cover the ground. Whether the vegetation substantially covers the ground is determined by reference to the density of the coverage of the ground by trees, shrubs, grasses, and other plant species in the area adjacent to the relevant portion of the riverbed; and
 2. "Vegetation line" means the visually identifiable continuous line of vegetation that is adjacent to that portion of the riverbed kept practically bare of vegetation by the natural flow of the river and is continuous with the vegetation beyond the riverbed. Stray vegetation, patches of vegetation, or islands of vegetation within the riverbed that do not form such a line are not considered part of the vegetation line. Where the riverbed is entered by the inflow of another watercourse or is otherwise interrupted or disturbed by a man-made event, the line constituting the boundary is an artificial line formed by extending the vegetation line above and below the other watercourse or interrupted or disturbed area to connect and cross the watercourse or area.
74 O.S. Supp. 1999, § 6106[74-6106] (Article II[A]).
¶ 27 The legislatures merely have told certain administrative officials to engage in fact-finding to determine where the Oklahoma-Texas line is on the ground. The Oklahoma Legislature, by providing tremendous detail about maps to use, and both states, by defining "vegetation" and "vegetation line," have given executive branch officials all the guidance needed to carry out the policy.
¶ 28 The answer to your third question, therefore, is yes, the legislature may delegate power to draw the map of the Texas-Oklahoma line without requiring that map to return to the legislature for approval. Furthermore, the other modifications contemplated appear to be relegated to clerical matters related to wording. The legislature may delegate that function, as well.
¶ 29 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. The states of Oklahoma and Texas may enter an agreementthat allows each state to exercise sovereignty over lands thatpreviously were under the control of the other state, as proposedin the 47th Oklahoma Legislature's Enrolled Senate Bill 175, § 2,to be codified at 74 O.S. Supp. 1999, § 6106[74-6106].
 2. The states of Oklahoma and Texas may allow landowners inexchanged territory resulting from boundary changes between thestates to retain property rights granted by the original stateeven though such property rights are not held by other citizenssimilarly situated in the receiving state, as proposed in S.B.175, § 2, to be codified at 74 O.S. Supp. 1999, § 6106[74-6106].
 3. The State of Oklahoma may delegate to an Oklahoma Red RiverBoundary Commission designee the power to negotiate with theState of Texas on the drawing of the exact location of theboundary between Oklahoma and Texas without requiring subsequentlegislative approval of the negotiated agreement, as provided inS.B. 175, § 2, to be codified at 74 O.S. Supp. 1999, § 6106[74-6106].The State of Oklahoma may also delegate to such a designee thepower to negotiate away clerical and administrative differencesbetween the states' versions of an interstate compact, asprovided in S.B. 175, § 3, to be codified at 74 O.S. Supp.1999, § 6107[74-6107].
 4. The United States Congress may ratify the proposed borderagreement between Oklahoma and Texas in S.B. 175, § 2, to becodified at 74 O.S. Supp. 1999, § 6106, even though it issubject to clerical and administrative modification, includingincorporation of a subsequent agreement drawing the exactlocation of the boundary line between Oklahoma and Texas, withoutlegislative or congressional approval.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
ANDREW TEVINGTON ASSISTANT ATTORNEY GENERAL
[1] For this history and the rest of the chronicle presented about the events surrounding the Oklahoma-Texas border see generally Oklahoma v. Texas, 256 U.S. 70 (1921).
[2] Oklahoma's portion of the Red River Boundary Commission was created by 74 O.S. Supp. 1998, §§ 6101[74-6101] to 6104.
[3] In the body of this Opinion, Oklahoma's version of the proposed boundary agreement will be referred to by its proposed statutory citation rather than the legislative bill number. Where Texas's and Oklahoma's versions of the agreement are the same, only the Oklahoma's version will be cited unless it is necessary to the discussion to show similarity between the versions.
[4] Hereafter, the Texas version of the boundary agreement will be cited as "Texas § 12.xxx."
[5] The list of minor differences is not comprehensive. A complete recitation of the inconsequential differences serves no useful purpose.