HOLT v. CHILDERS, State Auditor.

No. 32503. April 16, 1946.

*168 P. 2d 890.*

Walter L. Gray and John Carruthers, both of Oklahoma City, for plaintiff.

Mac Q. Williamson, Atty. Gen., and Randell S. Cobb, First Asst. Atty. Gen., for defendant.

ARNOLD, J. We considered and approved as constitutional the act under authority of which the allocation here involved was made to the Department of Public Safety, H.B. No. 518, Title 74, S.L. 1945, ch. 1, p. 376, in Wells v. Childers, 196 Okla. 339, 165 P. 2d 358.

In disapproving the allocations considered in Wells v. Childers, 196 Okla. 353, 165 P. 2d 371, we said:

"Allocations or expenditures made under item 8, sec. 5, or sec. 6, H.B. 518, Title 74, S.L. 1945, ch. 1, p. 376, 62 O.S. Supp. 1945, §§ 139.2 (8), 139.3, for 'extraordinary protection of the State' are limited to those compelled by some unforeseen condition such as 'to repel invasion, suppress insurrection, or defend the State in war'—flood, famine, fire, earthquake, pestilence, or epidemics of disease which compel the State to put forward its highest endeavors to protect the people, their property, liberty and lives."

In the body of the opinion we said:

"In State v. Davis, 113 Kan. 4, 213 P. 171, an extraordinary expense was distinguished from ordinary expense, such as incurred by the state for promotion of the general welfare. It was said to be that compelled by some unforeseen condition which is not regularly provided for by law, as floods, famine, fire, earthquake, pestilence, war, or other conditions that will compel the state to put forward its highest endeavor to protect the people, their property, liberty and lives."

The controlling facts presented by this original proceeding to compel the State Auditor by mandamus to set up an account as directed by the Governor, transfer the money allocated thereto and pay valid claims filed against the account are: On the 24th day of Jan-

uary, 1946, the Governor executed and filed with the Secretary of State certificate of authority No. 16, which is self-explanatory of the matters investigated and determined by him and is as follows:

"Pursuant to authority vested in me by Chapter 1, Title 74, page 376, Oklahoma Session Laws 1945 (62 O.S. Supp. 1945) (§ 139.1 to 139.4) and the mandatory duty placed on me, as Governor of Oklahoma, by Section 8, Article 6 of our State Constitution to 'cause the laws of the State to be faithfully executed, . . . and he shall be a conservator of the peace throughout the state,' there is hereby allocated from the Governor's Contingency Fund, created by said act, Account No. 10500, to the State Department of Public Safety the sum of $30,000.00 to be used by said department for the employment of not to exceed 25 additional patrolmen at annual salaries of not to exceed $2,700.-00 each, in order to assist said department in carrying out the duties required of it by law during the remainder of the fiscal year ending June 30, 1946.

"This order is made and the allocation of funds set forth therein authorized because the Twentieth Legislature (which adjourned on April 26, 1945, at a time when motor vehicle travel on the highways of ·Oklahoma and resulting traffic violations and highway accidents were extremely light by reason of thousands of Oklahoma citizens being absent from the State in defense plants and the armed forces of the United States and by reason of gasoline rationing) in the General Departmental Appropriation Bill (Senate Bill No. 9) for the fiscal year ending June 30, 1946, made an appropriation in an amount only sufficient to pay the annual salaries ($2,700.00 each) of the 79 patrolmen of the State Department of Public Safety for the fiscal year ending June 30, 1946, which appropriation, while adequate at the time made, is now wholly inadequate by reason of existing conditions not foreseeable by said Legislature prior to its said adjournment, to wit: (a) the termination of hostilities against the Axis powers on May 8, 1945 and against Japan on September 2, 1945, (b) the subsequent return to this State of a large majority of said citizens and the lifting of gasoline rationing, (c) the

consequent greatly increased motor vehicle travel on the highways of Oklahoma, and (d) the resulting approximate doubling of traffic violations and highway accidents and the consequent great and increasing loss of life and property of the citizens of this State. That, by reason of the above extraordinary and unforeseeable conditions, I find that an emergency exists; and that, therefore, it is now absolutely necessary, in order that the laws of the State may be faithfully executed and the lives and property of its citizens protected, the allocation set forth in the preceding paragraph hereof be made.

"It is ordered and directed' that the above allocated funds shall be used for the employment of patrolmen, as aforesaid, and for no other purpose, and that if any of the funds so allocated remain unexpended on June 30, 1946, the same shall not be expended by said department or transferred to any other item of appropriation of and for said department, but shall revert to the Governor's Contingency Fund.

"All claims contracted against this allocation shall be presented in the usual manner and paid out of the above-named fund when authorized and approved by the Commissioner of Public Safety."

A claim for services performed pursuant to appointment as a highway patrolman by reason of the alleged, determined, and declared emergency existing by reason of greatly increased hazardous traffic conditions upon our highways, was filed by one Holt, the petitioner, and rejected by the State Auditor on the authority of our holding in Wells v. Childers, supra, and the opinion of the Attorney General bearing date of January 5, 1946; the Legislature that created the Governor's Contingency Fund made provision and set the salaries for 79 highway patrolmen, reducing the number theretofore provided by 55. This reduction in number of highway patrolmen was made by the Legislature in accordance with the recommendation of the Department of Public Safety and the budget officer appointed by the Governor.

We held in Wells v. Childers, supra, that H.B. No. 518 was sufficient as to

specification of purpose and amount of the appropriation made. We also held therein that the power vested in the Governor thereunder is administrative —not legislative. The duty to determine the existence of a real emergency and allocate funds therefor, if available and an emergency is found to exist, was thereunder cast upon him.

When the Governor has made a determination of the existence of such emergency, as set forth in his findings, this court will not disturb the same except "for a lack of power or an abuse of discretion". Commonwealth ex rel. Meredith v. Johnson, Governor, 292 Ky. 288, 166 S.W. 2d 409, 415; Vandergrift v. Riley, 220 Cal. 340, 30 P. 2d 516; Prideaux v. Frohmiller, 47 Ariz. 347, 56 P. 2d 628. It is to be presumed that the Governor made proper investigation; that the facts disclosed to him support the findings made by him. There is no showing that he abused the duty and discretion imposed by the law. Under his findings and determination a real emergency exists affecting the life and property of the many millions using the highways at all times. The only question remaining is: Was the existing emergency foreseen, foreseeable or reasonably to be anticipated by the Legislature? In this connection it should be noted that the war was not at an end and no one knew just when it would end and certainly no one knew when the rationing restrictions affecting travel on the highways would be lifted, and no one could foresee when industrial conditions would relieve the generally inefficient condition of means of highway travel or the extent to which highway travel would increase. Of course, as the state contends, we all anticipated that the war would some time end and we all thought that probably rationing restrictions, affecting highway travel, would end and that there would some day be a great influx of travelers on the highways. But when these things would occur or to what extent the hazards thereof would be minimized or increased by other conditions not calculable no one could reasonably foresee. All the foregoing facts enumerated and those found by the Governor and the fact that the Legislature with the advice of the Public Safety Department and the Budget Officer reduced the number of highway patrolmen show that it did not anticipate the development of such an emergency. All the facts and circumstances found by the Governor and presented to us by the parties indicate to us that the Legislature did not foresee, nor could reasonably have foreseen, the development of the emergency found to exist. There is nothing to show us that the Governor abused his discretion and duty in the matter. He had the authority to make the allocation under the circumstances and it is approved.

Let the writ issue.

OSBORN, WELCH, CORN, and DAVISON, JJ., concur. HURST, V.C.J., and RILEY and BAYLESS, JJ., dissent.

---

RILEY, J. (dissenting). The legislative attempt at appropriation, House Bill 518, 20th Oklahoma Legislature, 74 S.L. 1945, ch. 1, p. 376, should be cured of its obvious infirmities.

Pending prior litigation involving the lump sum purported and adjudged to be appropriated, the Governor made eleven allocations from the fund. They were stricken down, Wells v. Childers, 196 Okla. 353, 165 P. 2d 371, as being unconstitutional. By a bare majority of the Supreme Court the lump sum appropriation had been sustained. Wells v. Childers, 196 Okla. 339, 165 P. 2d 358.

The court is now confronted with a claim filed by Norman C. Holt, a highway patrolman. He seeks a writ of mandamus to compel the State Auditor to pay his claim from a portion of the lump sum appropriation allocated by the Governor for payment of salary to patrolmen employed by the Department of Public Safety.

This Department of Public Safety is a centralized police force consisting of a commissioner and members selected

y the Governor, who are responsible olely to the Chief Executive for the performance of their duties.

By a certificate of authority under which the allocation was sought to be made, the Governor evidenced his purpose to increase the membership and/or numbers of the centralized authority. Mr. J. K. Wells, a citizen, taxpayer, and litigant in the former cases, supra, has been denied the privilege of intervening. But, by order of this court, he has been permitted to appear as a friend (amicus curiae) of it. He has challenged the Governor's certificate of authority and allocation.

In the case of Wells v. Childers, supra, this court defined "emergencies and contingencies." It declared:

"Allocations must fall within contingencies and emergencies specifically enumerated to be constitutional, or must be of extraordinary protection to the state and for which appropriation has not been made . . . 'Extraordinary protection of the state' must be limited to the meaning well defined in law, by Constitution, statutes, and judicial decisions, i.e., 'to repel invasion, suppress insurrection, or defend the State in war,' sec. 24, art. 10, Constitution, or the like."

The Supreme Court may not exercise supervisory or original legislative authority. In re County Commissioners Comprising the Seventh Judicial District, 22 Okla. 435, 98 P. 557.

It is to be noted that the gubernatorial attempt at recital of a contingency or emergency does not find as a basis for the allocation either "a flood, a famine, a fire, an earthquake, a pestilence, or a war." But the expenditure from the public treasury is nevertheless sought to be based on a contingency or emergency purported to be stated on paper.

If the future is to be judged by the past, a present denial of mandamus will not stay or avoid such ·future allocations until the fund is exhausted.

The people have witnessed this innovation and method of executive-legislative appropriations. Will any citizen doubt where the practical, if not constitutional, political program will lead the state? The original act creating the lump sum appropriation did not specify its object as constitutionally required. The objects of the expenditures were plural, a multiplicity. The Legislature, in making an appropriation, must "distinctly specify . . . the object to which it is to be applied." Section 55, art. 5, Constitution. The act is one of glittering generalities, both as to amount and as to object of disbursement. The one definite feature of the act is a provision for unlimited discretion to be exercised by the Governor in his allocations of the fund.

A continuance of judicial supervision in allocations to be made from the fund will have the effect of substituting the discretion of the Supreme Court for that of the Governor. Thus, if the function of the Supreme Court is augmented by the assumed legislative power which, the court his held, the Constitution denies to the Governor, no longer will we have a government republican in form. But such a judicial "service" will be subversive of civil liberty.

The court was intended as a bulwark of liberty and property rights. It may · not properly enforce executive orders or decrees except · in reliance on the statutory law or constitutional mandate.

The court cannot serve the sword; it is not an emblem of justice but a rule of action. If those who wear the ermine give consideration to the abortive legislative policy at variance with the Constitution, the judicial function will be destroyed.

This court may as well strike down the mask of hypocrisy and lay bare the naked truth. If the appropriation should be declared unconstitutional, the ship of state might be piloted into a channel of constitutionalism. Such a decision could be predicated upon Shaw v. Grumbine, 137 Okla. 95, 278 P. 311. That decision limited the number and salaries of legislative employees. Of course, there is an easier way, but it

develops a power such as may interfere to prevent or influence the free exercise of the right of suffrage. By the easy way, the Department of Public Safety will be without any manner of legal supervision. Its numbers may then be multiplied with cost to be paid from the lump sum appropriation; all this subject only to the Governor's illimitable discretion.

The Nineteenth Oklahoma Legislature provided for 134 patrolmen for the Department of Public Safety (S.L. 1943, pp, 246, 326). The Twentieth Legislature reduced the number to 79 but increased the salary of the highway patrolman by $900 per capita, per annum; a legislative appropriation was made for the number of highway patrolmen finally and definitely established by the Legislature, S.L. 1945, pp. 387, 461. After the legislative adjournment, and on January 24, 1946, by the certificate of authority and allocation, the Governor sought to do that which the Legislature did not do; an act diametrically opposed to law because it is in its nature legislative. The Governor increased the number of the very efficient and patriotic Oklahoma organization which, if it had its being in the late enemy alien country, it would have been known as the gestapo of SS Elite troupers. It is a power for good or evil but its organization must be legislatively created.

The State Highway Patrol, which is the substance of the Department of Public Safety, is unrestricted and irresponsible in matters of policy, political matters, save to the Governor.

This court could take judicial notice that not so long ago a Governor caused lavish expenditures from the public treasury to be made by the State Highway Department on the eve of a statewide election at which a favorite as a candidate for gubernatorial succession was sought to be aided. Public employees became more numerous and more obnoxious along the highways leading to the voting booths until the time of election, when the favorite failed.

At the same time in Germany the people were in the hands of the police; the police were in the hands of the party; the party was in the hands of adventurers. No German court could or would issue an injunction, a writ of certiorari, or of habeas corpus, for these, by decree, were suspended. Of course, the writs may not in fact be suspended in Oklahoma, for the Constitution provides otherwise, but Oklahoma has experimented with martial law and decrees have been issued by the Chief Executive, and occasional as they were, they had a tendency to break in upon the even tenor of our laws, for the Governor, who played at war, proclaimed under the circumstances of the emergencies, said by him to exist, that the judicial writ had no function to perform and, moreover, that his excellency would jail judges who interfered.

The revered pioneer statesman of Oklahoma who wrote the Constitution and adapted it to the teachings of Montesquieu well knew that if the legislative function were joined, as it is by the facts approved by the majority, with the executive function, an extension of the power may be as destructive of personal liberty and property rights as atomic power may be destructive of things material. While it may be that the Justices of the majority from that part of Oklahoma which constituted the Indian Territory have accustomed themselves to regimentation and rule, the people of God's great Western out-of-doors who settled on the last frontier have an inaptitude for such rule.

This may be considered an exaggeration. Emerson thought that in order to have any matter presented in its true light an exaggeration was justified, for it presents the issue naked and undisguised, free from those softening influences that in less strong cases veil innate deformities of governmental misrule.

The members of the supreme judiciary are inheritors of great traditions. They are not tame cats and they should not yearn for a warm place by the fire. Judges of an independent judiciary are

not automata of the corporate state to do the bidding of the administration in power (sec. 1, art. 4, Const.). The provisions of the Constitution are the criteria of governmental action and expenditures and should restrict the act of appropriating funds from the public treasury and allocating such funds, legislatively approved, to the particular object of expenditure.

The Governor allocated from the lump appropriation, Title 74 S.L. 1945, ch. 1, p. 376, the sum of $30,000 and seeks to devote it to the Department of Public Safety for employment of not to exceed 25 *additional patrolmen*. The State Auditor refused to pay claims out of the heretofore adjudged lump sum appropriation. Patrolman Holt instituted this original action. He seeks a writ of mandamus. Again the matter is tested in court.

The State Auditor has pleaded that the Legislature foresaw the situation and indicated its desire for a limited, efficient and faithful service. It has been pleaded and established from the public record that the Legislature knew, or is presumed to have known, of the increasing accidents and fatalities existing at the time of the legislative appropriation.

The Legislature was then cognizant that the war was then drawing to a close (S.L. 1945, Title 72, ch. 1b, secs. 1, 2, and 3, pp. 367-368). It knew, or should have known, of impending removal of restrictions upon highway travel. The legislative act attempting to make the lump sum appropriation (Title 74, S.L. 1945, ch. 1, p. 376) does not mention the particular contingency or emergency nor by specific terms authorize the Governor to declare it. The emergency sought to be recited by the Governor is not that of riot, insurrection, or war, as would be constitutionally allowable, sec. 24, art. 10, Const. of Oklahoma. The Legislature, by its act, definitely fixed the number of highway patrolmen and certainly the Governor may not legislate to amend the legislative determination as

to numbers, but if the emergency is real, the Governor has power to convene the Legislature on extraordinary occasion, sec. 7, art. 6, Constitution. Thus there is remedy for that which the Governor, as the supreme executive power, has determined to be an emergency but which he may not alone constitutionally remedy. Neither the court nor the Governor can usurp the legislative functions. Section 1, art. 4, Const.

No money can be paid out of the treasury of the state except in pursuance of an appropriation by law, sec. 55, art. 5, Const., and every such law making an appropriation shall distinctly specify the sum appropriated and the object to which it is to be applied. idem.

It is evident that the Legislature has not made an appropriation for the distinct purpose for which the fund is in part allocated by the Governor. Otherwise, why the necessity of the gubernatorial allocation?

The State Auditor has not acted arbitrarily in refusing the claim of Patrolman Holt because the Governor's allocation is at least of doubtful validity.

Mandamus will not issue in the absence of a clear legal right to the relief sought. Board of Com'rs of Carter County v. Worten, 128 Okla. 104, 261 P. 553.

The Legislature had an "opportunity to act," Wells v. Childers, 196 Okla. 353, 165 P. 2d 371. The Legislature may, by the Governor, be given another such opportunity, sec. 7, art. 6, Const. The Governor is without authority to exercise a discretion not validly and specifically granted by the statutory law and not within the power conferred upon the Chief Executive by the Constitution to make expenditures to "repel invasion, suppress insurrection, or defend the state in war" in the absence of funds specifically appropriated. The constitutional mandate states the real emergency which would "compel the

state to put forward its highest endeavors to protect the people, their property, liberty and lives."

No order, proclamation, or decree of the Governor of the state, as a Chief Executive thereof, has the force of law, the lawmaking power of the state being vested exclusively elsewhere. Russell Petroleum Co. v. Walker et al., 162 Okla. 216, 19 P. 2d 582. An appropriation such as was originally considered by this court, Wells v. Childers, 196 Okla. 339, 165 P. 2d 358, is void, State ex rel. Hudson v. Carter, 167 Okla. 32, 27 P. 2d 617, for there is no specific "authority of law for the Governor to approve an expenditure of money" sought to be applied. "The attempt to authorize the Governor to exercise such power is void under the provision of section 56, art. 5, Constitution," and "The Legislature is without authority to confer the power upon the Governor to do indirectly a thing which the Governor could not be directly empowered to do, that is, to reduce (or increase) an item in an appropriation bill." State ex rel. Crable et al. v. Carter, State Auditor, 187 Okla. 421, 103 P. 2d 518.

Moreover, the allocation is violative of state policy expressed by the Legislature to support the Department of Public Safety from license fees and the like and not from funds of the general revenue of the state. 47 O.S. 1941 §§ 313-370.

But it is urged and argued the public interest may suffer. Sheriffs, constables, patrolmen, and the posse comitatus serve or stand in wait to serve the public interest. State ex rel. Murray, Governor, v. Carter, State Auditor, 167 Okla. 473, 30 P. 2d 700. There is no emergency stated as by law required for the allocation.

**The writ should be denied.**