COPE v. CHILDERS, State Auditor, et al.

No. 32513.   June 1, 1946.

*170 P. 2d 210.*

Jim Gowdy, of Oklahoma City, for plaintiff.

Mac Q. Williamson, Atty. Gen., and James W. Bounds, Asst. Atty Gen., for defendants.

ARNOLD, J. This original proceeding involves the payment of a claim for services performed by plaintiff from January 30, 1946, to February 5, 1946. The claim was rejected by defendant on the theory that the allocation involved did not constitute an emergency under our decision in the recent case of Wells v. Childers, 196 Okla. 339, 165 P. 2d 358. The work for which plaintiff claims compensation was done in connection with on-the-job training and educational programs provided for veterans of World War II under the Servicemen's Readjustment Act of 1944, Public Law 346, 78th Congress, as amended by Public Law 268, 79th Congress (38 U.S.C.A. Supp. 693 et seq.).

The claim involved herein is one arising out of a $30,000 allocation of funds by the Governor to the Soldiers' Relief Commission of Oklahoma by virtue of House Bill No. 518, Title 74, S. L. 1945, ch. 1, pg. 376. This act is fully set out in the case of Wells v.

Childers, supra, to which reference is made. The act was approved as constitutional in the latter case.

The controlling facts presented by this proceeding to compel the State Auditor to set up an account as directed by the Governor in Certificate of Authority No. 17 and to issue a warrant thereon to plaintiff on his claim and the State Treasurer be directed to pay same are: On the 29th day of January, 1946, the Governor executed and filed with the Secretary of State the above referred to certificate which is self-explanatory of the matters investigated and determined by him, the pertinent parts of said certificate being as follows:

"That these Oklahoma veterans are anxiously seeking this training and the veterans' subsistence payments in order that they may fit themselves into the economic and social life of our great state at the earliest possible moment, with a subsistence which affords them and their families the actual necessities of life, and

"9. That unless Oklahoma provides these on-the-job training establishments and the state government provides the means of assisting local public schools and the individual business, industrial and agricultural establishments to set up and operate these training programs, these opportunities will not be available to our returning Oklahoma veterans and more than $2,-000,000 monthly in benefits provided for these veterans cannot be received by them, and . . .

"11. That the 20th Legislature did not foresee and could not anticipate this existing situation because the date of demobilization of Oklahoma veterans could not be foreseen and the regulations of the Veterans' Administration pursuant to the provisions of Public Law 346, 78th Congress, had not been issued and were not known to the 20th Legislature, and the amendments to Public Law 346, 78th Congress, being Public Law 268, 79th Congress, was not enacted until December 28, 1945, and these provisions for veterans could

not have been anticipated by the 20th Oklahoma Legislature,

"Now Therefore, I find that by reason of these facts an emergency does exist; and

"By authority vested in me as Governor of the State of Oklahoma by chapter 1, Title 74, page 376, Oklahoma Session Laws 1945 (62 O.S. Supp. 1945) (139.1 to 139.4), you are hereby directed and authorized to transfer from the Governor's Contingency and Emergency Fund the sum of Thirty Thousand ($30,000.00) Dollars to the Soldiers' Relief Commission of Oklahoma to be used by said commission for the purposes above stated.

"It is ordered and directed that the above allocated funds shall be used for the purpose:

"To employ personnel, pay communications, postage, travel expense, printing, and supplies for the purpose of visiting and processing establishments, and institutions applying for approval as Veteran Training Establishments, and for preparation of training courses and related subjects for veterans, for the period ending June 30, 1946, . . .'"

The Soldiers Relief Commission was created by 72 O.S. 1941 § 51, and an appropriation was duly made for such commission. It appears, however, that this appropriation has proved inadequate by reason of the emergency herein referred to.

The question involved herein was fully decided by this court in the recent decision in the case of Holt v. Childers, State Auditor, decided April 16, 1946, 197 Okla. 4, 168 P. 2d 890. We held in that case that when the Governor made determination of the existence of an emergency, as set forth in his findings, this court would not disturb the same except "for a lack of power or an abuse of discretion." That case is controlling in the present case.

There is no showing in the present case that the Governor abused the duty and discretion imposed by the law. Under his findings and determination, a real emergency exists affecting the welfare of the State of Oklahoma and its citizens. The emergency could not have been foreseen or reasonably anticipated by the Legislature. The appropriation to the Soldiers' Relief Commission was approved by the Legislature on March 29, 1945, and the Legislature adjourned on April 26, 1945. It was general knowledge that only a small percentage of our military personnel would be discharged before the war's end. At the time the Legislature adjourned the Allies had not yet won the war and many of our military leaders predicted that the war with Japan would continue for a number of years and our government was still making elaborate preparations for the future conduct of the conflict. The end of the war was unpredictable and the definite time when the bulk of the members of our armed forces would be returned and discharged was unforeseeable.

The Governor had the authority to make the allocation under the circumstances, and it is approved.

Let the writ issue.

OSBORN, WELCH, CORN, and DAVISON, JJ., concur. HURST, V.C.J., and RILEY, J., dissent.

———

RILEY, J. (dissenting). "Money" in the amount of $30,000, forming a part of a sum a little less than a million dollars, is to be *"paid out of the treasury of the State . . . in pursuance of"* a gubernatorial allocation, which, alone and exclusively, does *now* for the first time distinctly specify the sum (allocated) and the object to which it is to be applied.

It may be noted that words, clauses, and phrases of article 5, sec. 55, Constitution of Oklahoma, have been paraphrased in the preceding paragraph and that the constitutional provision prohibits all expenditures from the State

Treasury *except* in pursuance of an appropriation by law, the object of which appropriation, to be such, must be specified by the legislative bill making the appropriation.

The Governor cannot make a law, nor can he improvise an appropriation by the statutory device of an allocation. Indubitably, as the majority say in syllabus, the Governor has inquisitorial powers and as the result of investigation, the Chief Executive may find facts constituting, within his discretion, an emergency requiring exercise of the executive power to convene the Legislature in extraordinary session to consider and relieve the state from the true emergency if it exists or is remediable (Simpson v. Hill, 128 Okla. 269, 263 P. 635, 56 A.L.R. 706), but the constitutional limitation as to legislative specification of the object of expenditure of public funds may not be avoided by mere statute.

The Governor's duty is to *"cause the laws of the state to be faithfully executed,"* to discharge the duties of office with fidelity to the Constitution (art 6, sec. 8, Const. of Oklahoma), for, like other state officers, the Governor is oath-bound "to support, obey, and defend the Constitution of the United States, and the Constitution of the State of Oklahoma." Section 1, art. 15, Const. of Okla.

A fundamental principle of the Constitution is division of the powers of government into three separate departments, and according to the declaration, the departments "shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others." Article 4, sec. 1, Const. of Okla.

The function of appropriating public funds is an exclusive legislative function. The Legislature cannot delegate, in whole or in part, to the Executive Department the function nor the details of a duty in making an appropriation. Nevertheless, exactly that, in Oklahoma, is a fait accompli, the most astounding fact of which is that the process is sustained by the Supreme Court.

Whether the fall of the Third Republic of France was occasioned by force, fear, political perversion, propaganda, or collaboration of trusted officers with false doctrines was immaterial to prevent the fall of France. The life blood of a state is the finance of it and as it is viewed, by a novel departure from fundamentals the life blood of Oklahoma is not appropriated but dissipated for purposes not sanctioned by law. A statement of a prominent lawyer, a military statesman and former Speaker of the House of Representatives, regarding the decision of this court in Wells v. Childers, 196 Okla. 339, 165 P. 2d 358, sustaining an appropriation, should be remembered as tragic humor.

Such being the case, "as for the Constitution," to that extent "it is not too much to say that it is gone." Norman v. B. & O. R. R. Co., 294 U.S. 240. There was a time when, before salaries could be paid, there must be a law authorizing employment and fixing the amount of salaries. Shaw v. Grumbine, 137 Okla. 96, 278 P. 312. But these constitutional requisites are no longer necessary. Holt v. Childers, State Auditor, decided April 16, 1946, 197 Okla. 4, 168 P. 2d 890.

The virtue of the Constitution is prostituted. It is innoculated with a false doctrine and interlopers are as a result attached to the pay roll without legislative provision of office or employment. It is elementary in all but dictatorial totalitarian corporate states made and moved by rule that government predicated upon the idea of Rosseau's Social Compact are not to be governed by orders in Council, decrees, nor Executive Certificates of Authority.

By procedural substitution of the word "allocate" in lieu of the word "appropriate" and by statutory trans-

ference of the legislative power and duty to the Governor, from a lump sum legislatively set apart to provide for the general welfare, all of this is now accomplished by a certificate of authority and an allocation, and the majority thinks that there is in it no "lack of power or an abuse of discretion."

To "allocate" and to "appropriate" have the same significance. The former means to distribute, to assign, to allot, to apportion. It is the admission of an item into an account.

"Appropriate" is derived from two Latin words, "ad" and "propius." The word implies a use for one to the exclusion of other use. The meaning signifies an exclusive use. Western Union Teleg. Co. v. Buchanan (Tex. Civ. App.) 248 S.W. 68.

To appropriate is to set apart for a use in exclusion of all others (Wulzen v. Board of Sup'rs of San Francisco, 101 Cal. 15, 35 P. 353, 40 Am. St. Rep. 17); "to allot or assign," Western Union Teleg. Co. v. Buchanan, supra. To appropriate means to distribute, to *set apart* a sum of money for a particular object. Woodward v. Reynolds, 58 Conn. 486, 19 Atl. 511; Menefee, State Treas., v. Askew, 25 Okla. 623, 107 P. 159.

On January 30, 1946, from the bulk of a public fund within the State Treasury, approaching a million dollars, the Governor found a necessity, declared an emergency, and allocated $30,000 to the Soldiers' Relief Commission. Thus the Governor, in fact on that date, appropriated the public revenue. If he did so, he exercised a power properly belonging to the Legislative Department of government, in violation of article 4, Constitution of Oklahoma. A bare majority determined the act to be a legislative appropriation, Wells v. Childers, 196 Okla. 339, 165 P. 2d 358, and now the majority sanctions the gubernatorial allocation which, in fact, is the effective appropriation of public revenue. Thus in the equation and sus-

tained delegation of legislative authority, the constitutional requirement that the legislative bill shall distinctly specify the object of appropriation has no significance whatever.

The fundamental error is that the Governor, as Chief Executive, has no power of appropriation; nor may the authority of appropriation be delegated to the Executive Department, nor to the Governor.

Federally, the power to levy taxes and to appropriate money is not a power of the Executive but one vested in Congress "to pay the debts and provide for the common defense and general welfare of the United States."

Likewise, within the states and in Oklahoma, neither the Executive Department of government nor the Governor was intended, by the framers of the Constitution, to be vested with authority to allocate funds or appropriate money. That power, by article 5, sec. 55, was specifically vested in the Legislature, to the exclusion of executive power and authority. No part of the requirement constitutionally enjoined upon the Legislature may be delegated to another or other department of government.

The funds now sought to be allocated and consequently appropriated have not heretofore been specified in total sum. The fund is made up in part by unexpended balances existing under similar acts and a cancellation of a fund appropriated to another purpose. Neither has the object to which any part of the fund is to be applied heretofore been distinctly specified by either the Legislative or Executive Departments of government, nor the Governor. The consequence is that the Constitution is contorted to sustain a gubernatorial *allocation* of public revenue under a statute in lieu of an *appropriation* as required of the Legislature by Constitution.

The Governor is given authority, by article 6, sec. 12, to disapprove any item

of an appropriation bill before it becomes a law, but nowhere, by constitutional authority, has the Governor power to supplement, by itemization, the object of an appropriation and thus by gubernatorial allocation perform the legislative function.

The only affirmative action on the part of a Governor, required to give validity to an appropriation legislatively itemized, is the Governor's approval of the appropriation bill. Peebly v. Childers, 95 Okla. 40, 217 P. 1049; Carter v. Rathburn, 85 Okla. 251, 209 P. 944; State ex rel. Hudson v. Carter, 167 Okla. 72, 27 P. 2d 617, 91 A.L.R. 1497.

Article 6, sec. 12, Constitution, contemplates that an appropriation shall be made exclusively by a "bill passed by the Legislature," and that if the bill embraces "distinct items," it shall, before it becomes a law, be presented to the Governor, who shall have the power to veto as to each item of the bill and the bill itself. McAlester v. Oklahoma Tax Com., 174 Okla. 322, 50 P. 2d 647. But nowhere may an appropriation be made without distinct specification in the appropriation bill as to the object of expenditure.

It is not within the power of the Legislature to neglect its duty by failing to distinctly state the amount and object of an appropriation, abdicate its constitutional function of caring for the financial needs of the state, and delegate legislative power to the Chief Executive. To do so is to pervert government and violate section 1, art. 4, Constitution, which requires separation of the departments of government, Legislative, Executive, and Judicial.

The new system is reversion to the hodge-podge situation in government existing prior to the English Revolution by which Charles, for eleven years, dispensed with the services of a Parliament and, under the pretext of emergencies, levied such tribute upon the people for wars as please the executive. The king deemed it sedition against him and his government if in-

quiry was made as to the object of expenditures. Unfortunately, there was then no independent judiciary, and for abuse in government, the king was executed. It may be of historical interest to some that then for the first time, the Parliament wrote into the law: "No moneys shall be paid out of the treasury except in pursuance of an appropriation by law." A governmental fundamental in Oklahoma is expressed by the use of the same words displayed in our constituitonal provision together with the specification that the legislative appropriation shall be definite in amount and specific as to object.

Our constitutional specifications require of a legislative appropriation, definiteness and certainty as to amount and object of expenditure from the public treasury. No longer may the prototype of the Parliament, the Legislature, merely make allotments for war or lump sums for the public welfare, or vest a discretion in the Chief Executive as to the use of funds from the public treasury. It may not be logically gainsaid that if the Legislature has authority to require of the Governor the finding of an emergency and the allocation of public revenues as a condition of expenditure, the Legislature likewise has power to forego the requirement to bestow upon the Chief Executive authority to expend the public treasury, carte blanche. If then extraordinary sessions of the Legislature may be avoided thereby, there is no good reason why all ordinary legislative assembly may not become perfunctory or dispensed with altogether.

I find it most difficult to resolve, within constitutional limitations, state and federal, any authority by which the Governor may be made the effective sovereign or allowed to exercise a power purely legislative. Nevertheless, without color of authority, even statutory, with the sanction of this court, the Executive has:

"created a multitude of new offices and sent hither swarms of officers to harass

our people, and eat out their substance" (Holt v. Childers, supra).

"He has combined with others to subject us to a jurisdiction foreign to our Constitution and unacknowledged by our laws; giving his assent to their acts of pretended legislation . . . altering fundamental powers of our government . . . suspending our Legislature, and declaring (himself) invested with power to legislate for us. . . ."

As to King George, the Declaration of Independence assigned these reasons for war and had to say:

"A Prince whose character is thus marked by every act which may define a tyrant, is unfit to be the ruler of a free people."

My oath to uphold and defend the Constitution, inclusive of the provisions herein applicable, was no meaningless formality.

Mr. Cope, as petitioner, pleads: "The validity of the allocation is dependent upon an interpretation of item (8), section 5, H. B. 518, Title 74, S.L. 1945, ch. 1, p. 376, which purports to authorize allocations and expenditures in these words:

" '(8) Any circumstance, condition or situation which, in the judgment of the Governor, requires the expenditure of money for the extraordinary protections of the State and for which expenditures specific appropriation has not been made, but not excluding any other contingencies or emergencies not specifically enumerated.' "

If the section above quoted were valid, contrary to the prior decision of this court, specific appropriation has been made by the Legislature for the purpose to which the Governor seeks to direct funds by his allocation.

The petitioner says:

"This court, in Wells v. Childers, No. 32373, 165 P. 2d 371, said that an allocation under this section, to be constitutional, 'must be limited to meaning well defined in law, by Constitution, statutes, and judicial decisions, i.e., to repel invasion, suppress insurrection, or defend the State in war (sec. 24, art. 10, Const.) or the like'."

In the cited case this court struck down, for unconstitutionality, eleven gubernatorial allocations from the fund for they were not within channels of the statutory authority but bottomed on an uncontrolled and unlimited discretion sought to be vested in the Governor by item (8) of the act.

The majority, in granting the writ in the present case and under item (8) as sought, is either wrong now or they were wrong then. As for me, I cannot teach once that the world is round and again that it is square. The majority have not seen fit to overrule the prior opinion and decision of the court.

The Governor, by terms of item (8), as measured by constitutional limitation, either has an unlimited discretion to allocate the funds in the public treasury, or he has not. The Governor does not have the power now if he did not have it then. In safeguarding a function so vital to the people, as well as to the state in its corporate capacity, a particular explanation is required to support a decision of this court in departure from its rule and bottomed on a discretion. As pleaded, the people, the lawyer, the litigants nor I can understand such variability. An explanation has not been made in the majority opinion of the present case nor in the Holt Case, and until it is so made, it may be assumed that the issue rests within the will and pleasure of individuals.

The Twentieth Oklahoma Legislature made what it deemed an adequate appropriation for the Soldiers' Relief Commission and for the fiscal year involved and for the identical items now sought to be supplemented by the gubernatorial allocation. The legislative appropriation now supplemented was enlarged manyfold in the last legislative appropriation. Title 72, O.S.L. 1945, ch. 2a, p. 369.

It is something new under the sun

and in statecraft when by the statutory method indulged, the Governor may supplement the performance of the legislative duty.

The Constitution contemplated and requires of the Governor only the faithful performance of the executive duty. Certainly a supplemental allocation to complete legislative appropriation is a fusion in departmental powers, constitutionally prohibited.

The people, in due time, may know and be informed, and when the variability is known, the settled judgment of the people may condemn the innovation contrary to the Constitution. If so, the court will be in a sorry plight for having condoned such expenditures.

The Veterans of Foreign Wars case, No. 32331. [197 Okla. —, 171 P. 2d 618] presents a legislative act appropriating several thousands of dollars in funds for the purpose now sought to be supplemented by the questionable method of gubernatorial allocation. The V.F. W. cause has lingered long in this court, whereas relief by the political innovation now indulged has precedence and right of way.

The petitioner herein alleges "the artifice of language of the judges has caused confusion, at least among the naive." He says those he represents are not interested in the philosophy of the law; he leaves that, as he says, to "Omar and his jug of wine." In propaganda he, pleading, denies "interest in the political questions mentioned," rabble rouses for "a warrior-representing the weary disconcerted horde of men and women who are returning home to lick their wounds of battle, re-establish themselves in a shaken society and recoup, if they may, their economic position in life." He says these present "a concrete state of facts for practical consideration and judicial application of the rules of law as established under the flag for which they fought." The simple answer is that if the cause for which these patriots fought was not the philosophy of law, inclusive of equity

and justice and due process under a constitutional government, the war was waged in vain. In that event, we lack vision to perish. The power of creation is to be exercised with vision and understanding. It exacts a philosophy of law—"a theory of its Genesis" say Cardozo—(The Growth of Law, p. 132) is aim and growth. "Only thus," says he, "shall we be saved from empiricism which finds in an opinion, not a prophecy to inspire but a command to be obeyed." Justice Brandeis, speaking for the Supreme Court of the United States (State of Washington v. Dawson & Co., 264 U.S. 219), made use of the same thought. I hope there can be no mistaking my language nor my opinion. It may suffice to say the entire legislatively-executively construed appropriation and all expenditures from the funds thus sought to be established is nonetheless robbery that it is done under guise of law. That Robin-Hood-like the funds or a part of them may go to a worthy cause is no excuse for the extraction from the public treasury in this haphazard method. The method is a new and unconstitutional system of depleting and extracting from the public treasury funds for purposes charitable, political, and for public use but in violation of law.

The Soldiers' Relief Commission, by legislative act, 70 O.S. 1941 § 51, 72 O. S.L. 1945, p. 368, H. B. 158, is limited by terms of the legislative act to appoint "only such service officers, claims representatives, or related personnel as is provided for in bi-annual appropriations by the State Legislature." But now by the Governor's certificate of authority, and majority sanction, the commission is authorized to appoint and employ additional and unlimited personnel. If that authorization is sufficient, it is but rule unlimited, and if the state is to be governed by rule unlimited so that, as the majority say, "this court will not review the findings made by an administrative officer . . .," it would seem that the court, in respect to such vital matters as are now

under consideration, serves no useful purpose, for the Governor's action, as Chief Executive, in all such matters may now predicate his action upon his "investigations and determinations of existence of emergency." The Constitution stands opposed to such government. This court exists for the state's purpose; to require adherence to the mandate of the Constitution.

This Supreme Court exists as an instrumentality of government, manned with individual justices, nine in number, retained by the people and oathbound for the state purpose of requiring adherence to the mandate of the written Constitution. With failure in this regard there ought to be a change in philosophy and in law, for there is no right, save in the abstract, without a remedy.

House Bill 518 created a cash fund, indefinite in amount. It was designated the Governor's Emergency and Contingency Fund. It is estimated to be over $900,000. The lump sum so segregated was sought to be allowed to be expended by the Governor or by his authority. In other words, the Governor was sought to be delegated a power to delegate a power to spend money and to delegate power to spend it within a discretion unlimited.

There was no duty imposed upon the Governor, as the majority say, "to make investigation," for the Governor's determination was in fact all that was contemplated by the act.

By the people, the Governor was not given a roving commission to inquire into evils that might afflict the body politic, and upon discovery, to spend wealth for the correction of the evils. The people gave the Governor a commission to be the Chief Executive officer, not in France nor Washington, D. C., but in the State Capitol in Oklahoma City. When the people commissioned the Governor as Chief Executive, they did not make him the whole show, for, as provided by that Consti-

tution, the corporate state is comparable to a three-ring circus, said to be judicial and legislative as well as executive. No more in this Western country do we have open range, to rove at large, to perform at will.

When by act of the Legislature, H. B. 518, the Legislature did not confine the delegated power nor fix it upon a contingency, but attempted to allow the Governor to say when, where, and how much, and what for the public treasury of the people would be expended, the act was void.

Legislative abdication by delegation and gubernatorial appropriation by allocation is the new system. Thus the circle is squared but that which was by the Constitution to be made square was circled and the people's rights are submerged within that circle and government of the people is prostituted.

As a member of the court expected to be a bulwark of constitutional government, I think by its opinion it dedignitized itself over the protest of four of its members and another who later joined the four to assert constitutionalism, Wells v. Childers, 196 Okla. 339, 165 P. 2d 371, and by a strict construction to right the wrong. But, alas, the individual justice has now departed and another has become the author of Holt v. Childers, 197 Okla. 4, 168 P. 2d 90, and another has joined up in Holt v. Childers under the rule of stare decisis.

The result is approved exercise of plenary power delegated by mere legislative servants of the principal, the people. All official servants are bound by the instrument of a contract, indented. Called "indented" because deeds or indentures or contracts inter partes were once written on one skin which was cut in half with jagged edge so when the duplicates were produced in court and fitted into each other they were seen to belong to one another, by the fitting into each other, just as here the so-called legislative appropriation

and the Governor's allocation do not constitute performance of a duty by the former and an administration by the latter supplementing the former, but a division of power and a diversion of the people's money.

The Constitution, sec. 1, art. 4, negatives the exercise of the legislative powers delegated by any other agency. Time is of the essence of the contract, social and governmental, under which the Legislature should have completed the itemization itself. The social contract is the Constitution.

This innovation is beyond my comprehension, and I think beyond that which the people intended by their frame of government.

Plenary power, being all power, inclusive and complete, may never be delegated by an agent, oath-bound, to exercise only a power limited and granted.

This principle is a two-edged sword, applicable to the executive as well as the legislative department of government. Each is bound by constitutional requirements. The judiciary should so declare, but instead the majority of the justices ratify the innovation. Unless the constitutional provisions are followed, the function of the court has a meaningless formality. But the original ultimate, the residuum of power, is vested in the people.

It is noteworthy that in the second Wells Case an allocation was made by the Governor for the employment of a person by the Historical Society and a claim was filed after his performance. The State Auditor rejected the Governor's certificate of authority and the allocation, for there had been no office or employment created by law, whereupon the Governor revoked the certificate of authority and withdrew the allocation. Shaw v. Grumbine, supra, guided the State Auditor. But this court, in Holt v. Childers, as to the employment of 25 highway patrolmen, by no other creation than the Governor's certificate of authority, did not do as the State Auditor had done. Had this court done so, doubtless the Governor would have withdrawn according to plan; the money and the Constitution would have been saved.

But now the court capitulates; the treasury is not safeguarded, and, in my opinion, there is abdication and usurpation of power. They are consolidated, not by rule stare decisis, for that rule is based upon a long series of decisions extending into the ages. It is fait accompli. I do not believe in such rule. When substance is diverted in a devotion to power, the framework of government is imperiled. Only by the exercise of executive power, delegated, may the act be vitalized. Without vitalization the sequestered substance of the people would remain in the coffers of the State Treasury to lapse and relieve the people from extended taxation which drives our citizenship away.

The seven objects and purposes for which the lump sum of funds by H. B. 518 sequestered may be spent by the Governor or by his authority are not involved in this case. Some of them may have sufficed for the Holt decision, if no legislative appropriation had been made for the centralized police force; that agency might have been considered a substitute for the army of the state, now in Federal service, and as an agency to suppress insurrection and riot. But even if the National Guard were in the state's service, it would have been limited in number of officers, soldiers and men to a table of organization as provided by law. These were not the only facts in the Holt Case. By certificate of authority only, offices were created and salaries were paid from the sequestered lump sum of the people's money. Such unlimited power of spending is not sanctioned by law.

Ours is not a government as in England, where, as Coke said, arbitrary power must rest somewhere and therefore it rests in Parliament and Parliament is the effective sovereign.

Officers of our government do not exercise the authority of Kings nor that of an Oriental despot. Power with us is in the people. Their stores may be spent only under legislative appropriation and within specifications, all itemized by the Legislature in bills of appropriation stated.

With consideration given to item (8) of the act, what standard for the expenditure does the act make? None are stated. The words employed allow expenditure at will. Has the Governor set up his own standards of expenditure? If so, what are they? Have they, at his will, been changed? Is the variability of the Governor's rule even limited by the doom as to rights of the employee of the Historical Society?

The consequence is absurd. Governmental action is devoid of regularity as by a Constitution intended. That Constitution is the standard of right and wrong. It is an instrument of the people's power and should govern the action of their servants, agents and employees in government, a Constitution neglected in the vicissitudes of policy and as the result of greed.

Were I a prophet, or the son of a prophet, or possessor of the qualities of Jeremiah, I would know that with emergencies to follow, this court and this government will be borne down, without a lofty and impelling idea to guide it.

Courts must canonize the Constitution, or be lost in the forces of nature; the judge's working tool is the law, his motivating thought should be regularity of conduct; his guide is the written Constitution. If life and government are to have meaning, and not to become the senseless sport of chance, actions must be measured by the state's moral law, the Constitution. Cox v. Oklahoma Tax Commission, 197 Okla. 12, 168 P. 2d 634.

The people may alter or amend their Constitution, but only in the method prescribed in the instrument itself.

The Constitution is the original and fundamental law. To permit change in it without strict observance of the rules therein laid down is a step in the direction of destruction in the stability of government itself.

The object for which money, "not excluding any other . . . emergency (sic) not specially enumerated," may be spent under the Governor's allocation, is a step in that direction of destruction of government.

Item 8 of the act allows it to be spent under "any circumstance, condition or situation, which in the judgment of the Governor, requires the expenditure of money. . . ." That is carte blanche authority; the provision is void.

Were it not so, within discretion unlimited, merely the will to do so, such an officer could spend and spend and spend to elect and elect and elect at the whim, caprice, fancy, or pleasure of those who exercise the will.

In the original Wells Case it was said by the majority there was "no suggestion of impropriety of any allocation made or contemplated." The historical record disputes the statement. The majority then thought: "conscientious and scrupulous supervision of the public officials in this respect constitutes a definite answer" to the challenge of authority, power, and the so-called appropriation itself. But in the Holt Case and in the allocation for the employee of the Historical Society and in the case at bar, the conscience and the scrupulous supervision of the public official, the paymasters of the state, have been superseded by a majority of this court.

A multiplicity of officers, servants, and employees have been sanctioned by a majority of this court.

A multiplicity of officers, servants, and employees have been created by merely a certificate of authority, and not by law. This is rule and not government.

In the second Wells Case this court held:

"As a matter of fundamental principle, the Legislature may not create any fund, designate it an appropriation, and delegate determination of the object of expenditure to any executive or administrative officer, at his discretion."

This court should follow the pronouncement now or overrule that decision after assigning in a written opinion a sufficient reason, if any there be. It was then thought by Chief Justice Gibson, Vice Chief Justice Hurst, Justices Bayless, Arnold, and myself, that:

"So to do not only would violate the Constitution (art. 5, sec. 55) . . ."

—and be violative of the prohibition against the exercise of powers which otherwise would fuse functions and consolidate authority to foil the purpose of a people. Constitution, sec. 1, art. 4.

The dissenting opinion of Mr. Justice Osborn in that case, though sought to be based on Holy Writ, erred in the expressed view as to the source of the majority's authority. The Constitution was the foundation of the decision as expressed in a syllabus of the opinion.

The majority opinion in the second Wells Case shows by the text that it was not, as the critic says, wholly founded upon isolated thoughts theretofore expressed.

That judgment considered the public purpose of Anglo-Saxon government and the written word of the frame of government which guided a people in the march toward civilization. Now the court departs from the line of march; this is a departure. The framework has been broken. Nevertheless, the Constitution, fragile and broken as it is, may serve as an object of art and a curiosity which, in less violent times, may guide return to principles of government.

Bible quoting in connection with the thought of violence expressed, and as to plenary power and authority delegated, reminds of Lord Byron's description of the man, as gentle as any who ever scuttled a ship or cut a throat.

The spirit of the state is the Constitution. Majority views, in my opinion, violate the letter and the spirit. The people's rights may be drowned in words, or, as Theodore Roosevelt said, "weazel words" may be employed to circumvent the people's rights.

By Constitution, the people giveth authority and power to legislators, but in House Bill 518, those agents of the principal lendeth the power to another public servant, the Governor; the transference of the power is prohibited by the people, who imposed a duty upon their judges to judge by the supreme law—the Constitution—so that when the individual judicial officers shall have passed away the house builded upon a rock shall not be rent asunder. So that it may be said, according to Moses: "Yet have I not seen the righteous forsaken, nor his seed begging bread."

Courts should abstain from arrogating to themselves power, yet the judgment of the law should be to the end that abdication of power by one department and assumption of it by another shall by the Constitution be held void. To yield is to appease and to appease in the presence of a duty is to subvert civil government.

The variable rule as applied in the Wells Cases, in the Holt Case and the case at bar cannot stand together. These rules present the issue stated by Lincoln, the house divided. Ours is a free government or it is rule and ruin.

I deemed it my duty to oppose that rule, but my official expressions of opinions have heretofore been suppressed under pretext of necessity of conference adjournment and the like, though in other instances the conference rule has not been so exacting, and the court has been open and in the discharge of its duty and justice has been administered without sale, denial, delay,

or prejudice. On the other hand, by violent action I have been twice removed from office in a domeless Capitol.

Bismarck thought old pensioners were easy to handle. There are exceptions to rule, even as promulgated by an Iron Chancellor. Judges were not intended to be tame cats to yearn for a warm place by the fire. Courts are not automata, to do the bidding of a Prince. Officers should not make the rules to enforce or relax them. Courts are to be guided by law.

In State Socialism there is concentration of power, sometimes without sense; and sometimes in such governments there is an utter absence of things spiritual in the life of the state.

France experienced total departure from a spiritual influence in the realm of Caesar. The old coin of Louis Phillippe I was milled *"Dieu Protege La France."* In America, the impression on the dollar is "In God We Trust." Separatists in the government of France prevailed; the prayer was omitted from the coin; the coin was recalled, to be substituted with paper currency. It is recorded: "June 14, 1940 Paris falls." The sister republic faltered and fell, to be revived by English and American blood and material manufactured, loaned and leased. American dollars secured these things as did the spirit of our government.

Departmental functions of government may not be integrated. Total power is not of this world. General welfare is limited to legislative appropriations itemized in the legislative bills of appropriation. Emergencies, such as war, insurrection, and riot are true emergencies. They, and they only, may be allayed with or without an appropriation, the cost to be subsequently paid by itemized legislative bills.

The Soldiers' Relief Commission is not impoverished, nor are the functions performed by it without governmental consideration. The Veterans of Foreign Wars have a service officer requisitioned by the state, under a statute. Those services afford the wreckage from the battlefields a medium by which federal relief may be secured. The services are to be paid for by an appropriation. It does not involve an allocation, nor a million dollars, but the decision cometh not out!

At statehood the Federal Government placed in trust with elected officers of Oklahoma a bounty of $5,000,-000 to be used in aid of common schools —a state purpose for education of the youth and the unborn but future citizenship. The bounty was augmented by rents and profits of school lands set apart in the western Oklahoma Territory. The faith and credit of the state were pledged by ordinance irrevocable to replace loans and safeguarding of the trust funds.

The funds have been dissipated; liens of more than 3,000 judgments involving $5,800,000 (State v. Weems, 197 Okla. 106, 168 P. 2d 629), as shown by brief on rehearing, have been lost and yet an allocation in lieu of an appropriation for extraordinary protection of the state and its welfare is devoted to other purposes within an unlimited discretion, and it is thought, in violation of law.

In the Weems Case the dictum of the fourth syllabus by the thought of another judge should be omitted. The matter was publici juris. I joined the majority in safeguarding by dictum the public interest, as had the Supreme Court of the United States.

The decision in the case at bar is a matter publici juris. The public interest is the same.

Moreover, the injustice of allocations to favored subjects in lieu of more needful emergencies is shown by the kindred cases. No emergency has been declared to recover new judgments on the 3,000 dormant judgments, as in the Weems Case. The money allocated flows elsewhere.

But it is manifest that which is everybody's business is nobody's business; the whole public weal is worthy of consideration by the Legislature.

Oklahoma, on its natal day, had a taste of a state, federal and public welfare program. It was one of education involving a duty devolved upon a commission, with the faults of bureaucracy, but elected officials manned it and it must be presided over by the Governor. The youth and unborn were entitled to a free and public education for the general welfare. The elected officials constituting the State School Land Commission were and are oath-bound; duties are to be secured by official bonds. But this situation has never presented even a contingency, much less an emergency, to receive the designation of "true" as by the Constitution stated for war, though the loss of judgment liens in the sum of more than five million dollars and three thousand cases are involved, according to the Attorney General's and the State School Land Commission's petition for rehearing, asserting a departmental construction.

An army of new employees may be, without sanction of law—Shaw v. Grumbine, supra, — foisted upon the people to infest the land and eat out the people's stores. This court should not approve such a system of statecraft. When the bars are down and the gate is open, the hogs, the sows, and the old boar himself will enter and the swill of allocated money will be no more—but the hogs will be there in the hog lot to present a contingency or an emergency for grain and gain despite the absence of positions and appropriations by law.

When once persons are enrolled on public pay rolls they are hard of dislodgement. Past state experiences, by the records shown, establish that practical politicians are experts, in some fields, and possessed of appetites insatiable.

The state has experienced improvisions of the projected New Order, Harden Mtg. Loan Co. v. Com'rs of Internal Revenue, 137 Fed. 2d 282, and opinions have not always been unanimous. Eckerle v. Ferris, 175 Okla. 117, 51 P. 2d 766. It was then thought such monopolies should not be sanctioned.

I yield to no man or officer in brief for soldiers or sailors for duty well done. Benson v. Benson, 125 Okla. 151, 256 P. 912, 62 A.L.R. 935 (war risk insurance); Love v. State Election Board, 197 Okla. 157, 170 P. 2d 193; Brown v. State Election Board, 197 Okla. 169, 170 P. 2d 200 (right of ex-service men to hold public office); Dusabek v. Martz, 121 Okla. 241, 249 P. 145 (libel and slander upon soldier's war record); State ex rel. Com'rs of Land Office v. Worden et al., 197 Okla. 97, 168 P. 2d 1010 (soldiers' and sailors' moratorium as to judgments against them in their absence).

Nor do I yield against the law to permit "treasury raiding" in the absence of an appropriation by law, nor the circumvention of a Constitution for any purpose. The Constitution is something among friends; to remain silent, officially witnessing the destruction, is a sin. Holt v. Childers should be overruled. This court's first decision in Wells v. Childers, declaring the sequestering of funds to be an appropriation, should be limited. Vagaries now presented in constitutional law are most unusual. The people should govern themselves accordingly for the preservation of their government.

Governmental power was once thought to descend from God. It was a divine right of King. With us, power ascends from the people, and while courts try cases, cases also try courts (Justice Robert Jackson) and judges are subject to trials for matters of opinion as this writer well knows by the per curiam opinion in Simpson v. Hill, supra.

Every American citizen must concede

our judges to be animated with good intentions according to their individual motives and light. But decisions of the courts are not final. This, Abraham Lincoln and Franklin D. Roosevelt well knew. Processes of the initiative and referendum power are by Constitution reserved to the people. The people thereby reserve power of recall of judicial decisions and provide other legislative processes which have been invoked as to the inheritance of adopted children and the like. And so, the decision at bar may by the people be overruled. The people know that appeasement is defeatism. In the end, right denied by erroneous judgment, but vigorously maintained by a few, may result in a people's major victory, hence the provision in law for minority views to be recorded and published for the public purpose. The Constitution safeguards expression of "sentiments upon all subjects" by the individual or officer of the people's agency charged with performance of a public duty. Such an individual or officer "being responsible for the abuse of that right." Section 22, art. 2, Constitution of Oklahoma. An oath is prescribed by statute and required of an attorney-at-law. If the attorney knows of wrongdoing, he will inform the court or some one of its members, that it may be reformed. The judge or the court is expected to do something about wrongdoing. This achieves the public purpose. Without such resort to the printed page and official reports to right wrong, revolution with all of its horrible aspects would ensue. Fundamental issues are confined in our government to judicial forums provided with a means to give expression as to matters private and publici juris, so that the citizenship may know and be informed in their selection of men and their determination of issues; that determination may be had in the elector's battle of the ballots.

In the case at bar, no adequate solution has by the court been found to solve the innovation of an executive-legislative allocation as existing in lieu of a legislative appropriation as contemplated by the Constitution. The consequence is that the issue at bar presents a public question for final solution by the people or their representatives in the Legislature.

The court conferences have resulted in opinions adverse in philosophy of law and between majority and minority groups we have come to grips between grim realities in fundamental principles.

The conflict may reveal hidden truths for the people's decisions. This court is not of one mind, nor of one world of thought, but when the people decide the issue presented their mandate will be understood by us and our successors in office. Then a new and undivided judicial world will exist within this jurisdiction, the home of the red man who so often has resorted to the tomahawk and to the pipe of peace. After mandate of the people, the court will construe and administer the law, not as based upon a fait accompli constituted of facts stated in an executive certificate of authority, for facts do not mould the law. At that time with some certainty there will be an administration as contemplated by the Constitution, one of "Justice under Law."

This court will be constructed upon a different plane. The balance of power will not be known by numbers according to diverse opinions or members voting. There will be no suppression, but reasoned opinions with a syllabus by the court in every case, whether of original or appellate jurisdiction as required by statute. Then minority views will be read in conference and published, because the court will not adjourn but be open and in the discharge of duty to afford a remedy for every wrong; and justice shall be administered without sale, denial, delay, or prejudice so as to provide a remedy for every wrong.

In the consideration of numerical equations, it has been said, God and one constitute a majority. The saying

is afar from the partnership claimed to exist between the last of the Kaisers and Deity.

"Truth will not be sold to save the hour," nor will opinions be edited. The time-honored diplomatic policy to serve peace and tranquility for the spirit of law and order is to avoid conflict and to yield. The duty under law is otherwise. The times and the customs and positions in public office vary the duty enjoined upon servants of the people. These stations are of jurists. These duties considered involve offices of statesmen.

The Jews have been burned and gassed throughout the ages, but as a race they have not abandoned the faith of their fathers. We may not preserve the pomp and power of Anglo-Saxon civilization by doing so nor serve the Constitution as to its requirements by mere certificates of authority finding emergencies within unlimited discretion even as to the general welfare.

No jurist in Oklahoma ought to be required to speak of law as a power inflexible to be conquered; of equity as complacent to the conqueror, of procedure as a method to suit the occasion. Statesmen do not govern themselves by the dictates of their interest nor render hasty opinions to absolve or condemn. Time is adequate for due process of law. Judicial opinions need not always resort to an offering of the execrable incense contained in a verse quoted from the Bible and subject to misapplication with the hope of moving the spirit of men in consideration of constitutional law.

Such insistence, suppression, and eloquence kindled the fires that consumed France, for it provoked action unwanted; it subjected all as legitimate prey to the mob. Such were the mental processes of Wilhelm and Hitler.

The performance of a justice's duty is not always one of pleasure, nor of benefit to himself or his party. However, democratic processes and division of governmental powers are of paramount importance. This is the genesis of the law.